1  Trenton R. Kashima (SBN 291405)
2  **MILBERG COLEMAN BRYSON**
   **PHILLIPS GROSSMAN PLLC**
3  401 West C St., Suite 1760
   San Diego, CA 92101
4  Tel: (714) 651-8845
   tkashima@milberg.com
5
6
   Julie Erickson (SBN 293111)
   Elizabeth Kramer (SBN 293129)
   Kevin Osborne (SBN261367)
   **ERICKSON KRAMER OSBORNE LLP**
   44 Tehama Street
   San Francisco, CA 94105
   Tel: (415) 635-0631
   julie@eko.law

*Attorneys for Plaintiffs and the Class*
[Additional counsel listed on signature page]

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

LARRY PEARL and ERIC VLADIMIRSKY, individually and on behalf of all others similarly situated,

Plaintiffs,

v.

COINBASE GLOBAL, INC. and COINBASE INC.,

Defendants.

Case No.: 3:22-cv-03561-MMC

**FIRST AMENDED CLASS ACTION COMPLAINT FOR:**

1. Negligence
2. Negligence *Per Se*
3. Negligent Misrepresentation
4. Violation of Cal. Bus. & Prof. Code §§ 17500, *et seq.*
5. Violation of Cal. Civ. Code §§ 1750, *et seq.*
6. Violation of Cal. Bus. & Prof. Code §§ 17200, *et seq.*

**JURY TRIAL DEMANDED**

**CLASS ACTION COMPLAINT**

Plaintiffs, LARRY PEARL and ERIC VLADIMIRSKY ("**Plaintiffs**"), on behalf of themselves and all others similarly situated, bring this class action against Defendants Coinbase Global, Inc. and Coinbase Inc. (collectively "**Coinbase**" or "**Defendants**"), and allege on personal knowledge, investigation of their counsel, and on information and belief as follows:

**INTRODUCTION**

1.      Since Bitcoin launched in 2008, the cryptocurrency market has grown to include over 6,000 digital currencies and other financial instruments that are used by millions of Americans.[1]

2.      Defendants promoted and categorized the TerraUSD (also referred to as "UST") as a "stablecoin"—a distinct type of cryptocurrency that is generally less volatile than its counterparts—despite the fact that TerraUSD lacks the qualities and characteristics which distinguish stablecoins from other types of cryptocurrencies.

3.      When the value of TerraUSD plummeted in May of 2022, investors lost an estimated $18 billion in a matter of days.

4.      Stablecoins differ from other cryptocurrencies, such as Bitcoin, because they are backed by an underlying tangible asset. TerraUSD claims to be "pegged" to the United States dollar ("USD") at a rate of one-to-one. That is, TerraUSD is designed to maintain a value of $1.00 per coin. Because it is purportedly "pegged" to a government-issued currency, and specifically the world's reserve currency, it is marketed as a type of investment that can "virtually eliminate volatility."

5.      In reality, TerraUSD is not backed by actual US dollars or any other tangible assets held in reserve. Nonetheless, Defendants referred to it, and continue to refer to it, as a "decentralized stablecoin" in their representations and marketing materials.[2] This was misleading

---

[1] Total market capitalization for the 11,000 digital asset tokens in existence is over $1.5 trillion.
[2] TerraUSD was designed to maintain its peg to the US dollar through Bitcoin reserves and programmatic mechanisms for maintaining the currency.

**FIRST AMENDED CLASS ACTION COMPLAINT; CASE NO. 3:22-CV-03561-MMC**

to Plaintiffs and Class Members who reasonably believed that TerraUSD was properly categorized as a stablecoin and posed less risks as compared to alternative digital assets available to them. Moreover, Defendants omitted material facts about TerraUSD, including the fact that Terraform Labs did not hold *any* tangible assets—such as another fiat currency or commodity—in reserve. Accordingly, the digital currency was never truly pegged to the US dollar.

6.      Coinbase holds itself out as a centralized marketplace for cryptocurrency traders. It is also a significant venture capital investor in early-phase cryptocurrency companies and one of the largest financial backers of Terraform Labs. In 2021, Terraform Labs used exchanges, including Coinbase, to create markets where TerraUSD could be traded. Terraform Labs' partnership with Coinbase allowed it to issue TerraUSD tokens to more investors and generated commissions and other profits for Defendants.

7.      To promote TerraUSD, Coinbase joined Terraform Labs in broadcasting claims that TerraUSD was pegged one-to-one in value to the US dollar. Coinbase knew, however, that TerraUSD was not actually backed by the US dollar and that a break from its peg was likely, if not certain. Yet Coinbase withheld this information from investors.

8.      TerraUSD would purportedly maintain its value at $1 through an arbitrage trading strategy involving its sister cryptocurrency, Luna:

> The way UST was intended to work was that whenever UST dropped below $1, traders could remove UST from circulation by exchanging it for a Luna stablecoin, which would reduce the supply of UST stablecoins, thereby raising the price. When the price of UST exceeded $1, traders were incentivized to remove Luna from circulation by exchanging Luna for UST, increasing the supply of UST and lowering the price.[3]

9.      On May 8, 2022, TerraUSD started losing value, and the mechanisms described above failed. Within weeks, TerraUSD and Luna became practically worthless.

---

[3] Expert Analysis: Stablecoin Legal Risks to Consider in Light of Terra Collapse. Perrie Weiner and David Sverdlo, June 8, 2022. Online article: https://www.law360.com/articles/1498216/stablecoin-legal-risks-to-consider-in-light-of-terra-collapse?copied=1 (last accessed June 9, 2022).

**FIRST AMENDED CLASS ACTION COMPLAINT; CASE NO. 3:22-CV-03561-MMC**

10.     Around the time of the collapse, over $2 billion US worth of TerraUSD were "unstaked" or removed from the anchor protocol that was allegedly capable of maintaining the stated 1:1 value or "peg" to the US dollar. Next, mass quantities of TerraUSD were immediately sold and, as TerraUSD started losing its value, risk-averse investors rushed to sell. By May 19, the value of TerraUSD had dropped below $0.08.

11.     Collectively, Plaintiffs and the Class Members lost millions—measured in terms of US dollars—in a matter of hours.

12.     Coinbase profits from every sale and trade made on its platforms. It is in the business of encouraging investors to buy cryptocurrencies. Moreover, it spent millions backing TerraUSD and had a vested interest in its success. As a result, Coinbase withheld the true risks inherent to TerraUSD and misled Plaintiffs and Class members who reasonably believed that they were purchasing a reserve-backed stablecoin.

13.     As a result of Coinbase's conduct, Plaintiffs and Class members have been damaged. Accordingly, Plaintiff, individually and on behalf of all persons or entities who transacted in TerraUSD on Coinbase during the Class Period (the "Class"), brings claims for equitable relief and to recover damages.

## THE PARTIES

14.     Plaintiff LARRY PEARL is and at all relevant times was a citizen of California residing in Huntington Beach, California.

15.     Plaintiff ERIC VLADIMIRSKY is and at all relevant times was a citizen of California residing in Studio City, California.

16.     Defendant Coinbase Global, Inc. is a Delaware corporation.

17.     Defendant Coinbase Inc. is a Delaware corporation headquartered in San Francisco, California and is a wholly-owned subsidiary of Coinbase Global, Inc.

18.     Coinbase Global, Inc. and Coinbase Inc. operate as a single company and users have no clear insight about which entity they are transacting with. Coinbase refers to the two

**FIRST AMENDED CLASS ACTION COMPLAINT; CASE NO. 3:22-CV-03561-MMC**

entities jointly as the "Company" in its SEC filings. Coinbase created and operates a website from which customers can buy and sell digital assets – the Coinbase platform, on which TerraUSD was traded.

19.    Plaintiffs reserve the right to amend this Complaint to add different or additional defendants, including without limitation any officer, director, employee, supplier, or distributor of Defendants who has knowingly and willfully aided, abetted, or conspired in the false and deceptive conduct alleged herein.

## JURISDICTION AND VENUE

20.    This Court has general jurisdiction over Defendants because Coinbase is headquartered in California. Further, this Court has specific jurisdiction for the claims set forth herein because it has, at all times relevant to this matter, individually or through its agents, subsidiaries, officers or representatives, operated, conducted, engaged in and carried on a business venture in this state and maintained an office or agency in this state, and marketed, advertised, distributed and sold products in this state, committed a statutory violation within this state related to the allegations made herein, directed at consumers in this state, and caused injuries to Plaintiffs and proposed Class Members, which arose out of the acts and omissions that occurred in the state of California, during the relevant time period, at which time Defendants were engaged in business activities in the state of California.

16.    This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C.§ 1332 of the Class Action Fairness Act of 2005 because: (i) there are 100 or more proposed Class Members, (ii) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because a substantial number of proposed Class Members are citizens of states different from Defendants. This Court has supplemental jurisdiction over Plaintiffs' state law claims pursuant to 28 U.S.C. § 1367.

17.    Pursuant to 28 U.S.C. § 1391(b)(1), venue is proper because Coinbase is headquartered in this District. Venue is also proper pursuant to 28 U.S.C. § 1391(b)(2) because a

FIRST AMENDED CLASS ACTION COMPLAINT; CASE NO. 3:22-CV-03561-MMC

substantial part of the events giving rise to the claims asserted occurred in this District. Venue is also proper pursuant to 28 U.S.C. § 1391(c) because Defendants conduct substantial business in this District, have sufficient minimum contacts with this District, and otherwise purposely avail themselves of the markets in this District, through the promotion, sale, and marketing of digital assets in this District.

## FACTS COMMON TO ALL CLASS MEMBERS

### A.   Stablecoins Are a Distinct Type of Cryptocurrency

18.     Cryptocurrency is a type of digital asset originally intended to serve as a medium of exchange designed to work like fiat currency but without the control or oversight of a centralized government authority.

19.     The inception of cryptocurrency was lauded as an end to banks and centralized currency because it offers the same anonymity as physical cash. Despite its potential, cryptocurrency has yet to deliver on its promise to end traditional banking. Moreover, as compared to fiat currency, such as the US dollar or euro, the value of cryptocurrency is highly volatile, with many of the top-traded cryptocurrencies fluctuating more than 100 percent in value in a single year.

20.     In 2014, several companies started issuing "stablecoins" which, as the name suggests, are intended to add stability to an otherwise volatile cryptocurrency market.

21.     Stablecoins differ from other cryptocurrencies because their value is "pegged, or tied, to that of another currency, commodity or financial instrument."[4] For each coin issued, the issuer maintains a pegged value by holding an equal amount of underlying hard assets in reserve as collateral. Stated differently, stablecoins are "collateralized" because they are backed by an underlying tangible asset. Traditional cryptocurrencies are generally "uncollateralized," and their value is based on the market for the asset itself, contributing to their highly volatility.

---

[4] https://www.investopedia.com/terms/s/stablecoin.asp (last accessed May 23, 2022).

FIRST AMENDED CLASS ACTION COMPLAINT; CASE NO. 3:22-CV-03561-MMC

22.     Like many digital assets, stablecoins seemingly evade any comprehensive legal framework or government oversight. In recent years, legislators have proposed new laws, administrative guidelines, and proposals for regulating these assets, but it is presently unclear whether cryptocurrencies generally, and stablecoin assets specifically, are legally regarded as commodities, currencies, or some other type of financial instrument. Instead of lumping digital assets into one general category, each subset or type of cryptocurrency must be assessed individually to determine which regulatory framework is the best fit.

23.     While the legal framework within which stablecoins best fit is yet unclear, both legislators and regulators have expressed grave concerns over these digital assets. In November 2021, The President's Working Group on Financial Markets issued a report titled "Report on Stablecoins," identifying specific concerns relating to "misleading disclosures to the market" and risks associated with trading platforms.[5] More recently, US Treasury secretary Janet Yellen cautioned in a hearing that stablecoins are a "growing product and there are rapidly growing risks."

24.     As of the filing of this complaint, a proposed legislation would grant the Commodities Future Trading Commission full jurisdiction over cryptocurrency, including full regulation of stablecoins.[6]

25.     Based on information and belief, no agency or court of law has issued an opinion regarding the status of TerraUSD.

B.     **Terraform Labs**

26.     Terraform Labs[7] created the system within which TerraUSD operates, which includes TerraUSD, Luna (its sister token), the Terra blockchain (the programmatic technology

---

[5] https://home.treasury.gov/system/files/136/StableCoinReport_Nov1_508.pdf (last accessed June 14, 2022).
[6] https://apnews.com/article/cryptocurrency-technology-congress-government-and-politics-7d2e5c6ba2bfc66cc7b77954074d6c57 (last accessed June 14, 2022).
[7] Terraform Labs was founded by Do Kwon and Daniel Shin in 2018 and is a Seoul, South Korea-based internet services industry company.

**FIRST AMENDED CLASS ACTION COMPLAINT; CASE NO. 3:22-CV-03561-MMC**

underlying both cryptocurrencies), and the Anchor Protocol (one of the mechanisms Terraform Labs purported would bring about a stable 1:1 US dollar conversion rate).

27.     The Terraform whitepaper Coinbase published on its website makes several affirmative representations about the TerraUSD, including statements that TerraUSD is: (1) "price-stable and growth-driven," (2) "achieves price-stability via an elastic money supply, enabled by stable mining incentives," and (3) "the Terra Protocol solves" problems common amongst other digital currencies.

28.     But several statements within the whitepaper also appear to contradict one another. Terraform Labs describes its digital assets as a solution to market instability, which it describes as follows: "Intuitively, nobody wants to pay with a currency that has the potential to double in value in a few days, or wants to be paid in a currency if its value can significantly decline before the transaction is settled." Terraform purported that TerraUSD would solve this, but later states, that "[t]he existential objection of a stable-coin is to retain its purchasing power."

29.     The white paper also describes the relationship between Luna and TerraUSD, and the mechanisms for maintaining stability:

> The system uses Luna to make the price for Terra by agreeing to be counter-party to anyone looking to swap Terra and Luna at Terra's target exchange rate. … The system's willingness to respect the target exchange rate irrespective of market conditions keeps the market exchange rate of Terra at a tight band around the target exchange rate.

> Stable demand for mining is a core requirement for the security and stability of Terra. Unite mining rewards are the primary consideration and the biggest source of risk for miners. They are by default highly cyclical, hence highly uncertain. Reducing that uncertainty in the face of volatile conditions is the key to stable mining demand. We have outlined a simple mechanism that uses transaction fees and Luna burn as levers to achieve this, and demonstrated its effectiveness in the most severe economic conditions.

30.     Stated differently, when the prices of TerraUSD rises above $1 due to increasing demand, Luna holders can "mint" additional TerraUSD—and increase the total supply of TerraUSD—by exchanging $1 of Luna. Luna holders are incentivized to engage in these exchanges because the newly-minted TerraUSD can be sold for more than $1. Conversely, if the

8

demand for TerraUSD decreases and its price dips below $1, TerraUSD holders can create $1 of Luna by exchanging their TerraUSD for Luna (which in turn decreases that supply of TerraUSD and increases the supply of Luna).

**C.** **Coinbase Categorized TerraUSD as a "Stablecoin," Promoted the Asset, and Offered TerraUSD for Sale on Its Trading Platforms**

31.  Coinbase is an online marketplace that operates two digital asset exchanges, "Coinbase" and "Coinbase Pro," and describes itself as "building the cryptoeconomy–a more fair, accessible, efficient, and transparent financial system enabled by crypto." For Plaintiffs and Class members, that promise has proved illusory.

32.  Customers place orders to buy and sell cryptocurrencies through Coinbase's platforms, and Coinbase acts as a custodian of users' digital assets, holding asset encryption keys on behalf of its users. As an alternative, the company offers "Coinbase Wallet" which purportedly gives customers control and custody over their cryptocurrencies and corresponding encryption keys.

33.  Coinbase offers its US customers the power to trade over 150 cryptocurrencies and was at all relevant times the largest cryptocurrency exchange in the US by volume.

34.  Coinbase is not registered with FINRA or the SEC as a securities exchange or broker-dealer. It is, however, the holder of a "Virtual Currency & Money Transmitter" license under the New York Department of Financial Services' Virtual Currency Law.

35.  When Coinbase offers trading of a cryptocurrency, it publicly posts information regarding the asset, including a description of the asset and which Coinbase products support it (i.e. Coinbase, Coinbase Pro, or Coinbase Wallet). In a separate branch of the Coinbase website referred to as "Price charts," Coinbase provides historical data regarding the asset, including the asset's historical pricing, trading activity, market cap, and the number of times the asset has been mentioned on social media in recent days. It also links to the asset's white paper and website, where applicable.

36.     Coinbase users, including Plaintiffs and Class members, reasonably rely on this information in reaching their purchase decisions.

37.     Coinbase also offers educational resources for its customers to learn about the fundamentals of cryptocurrencies. Since 2021, and as of the present date, Coinbase has defined stablecoins to its customers on a page of its website titled, "What is a stablecoin?"[8] This page defined a stablecoin as "a digital currency that is pegged to a 'stable' *reserve* asset like the U.S. dollar or gold" (emphasis added). It further stated, "[s]tablecoins are free from the volatility of non-pegged cryptocurrencies" and "[a]n asset that's pegged to a more stable currency can give buyers and sellers certainty that the value of their tokens won't rise or crash unpredictably in the near future."

### Definition

A stablecoin is a digital currency that is pegged to a "stable" reserve asset like the U.S. dollar or gold. Stablecoins are designed to reduce volatility relative to unpegged cryptocurrencies like Bitcoin.

38.     Coinbase's definition of a stablecoin omits critically important facts about the family of digital assets that are marketed as stablecoins. Chiefly, the definition neglects to inform customers not all stablecoins use "reserve" assets to maintain a peg. It neglects to state that some digital assets that are referred to stablecoins are uncollateralized by any reserve asset and are instead designed to maintain a peg through an algorithm.

39.     Other cryptocurrency exchanges marketing stablecoins offer more thorough and accurate descriptions of stablecoins, including references to the key differences between stablecoins and uncollateralized algorithmic assets calling themselves stablecoins.

---

[8] https://web.archive.org/web/20211023101553/https://www.coinbase.com/learn/crypto-basics/what-is-a-stablecoin (last accessed June 13, 2022).

FIRST AMENDED CLASS ACTION COMPLAINT; CASE NO. 3:22-CV-03561-MMC

40.     Robinhood, another exchange where cryptocurrencies are traded, has since 2021 offered customers the following definition of stablecoins:

What are stablecoins?

Stablecoins attempt to peg their price to a specific value, such as the US dollar. This is sought in two ways: 1) by tying the coins to a pool of reserve assets or 2) by algorithmically controlling the stablecoin's supply. At various points though, some stablecoins have deviated from their intended values, in some cases resulting in losses for holders. […]

Algorithmic stablecoins have sometimes raised regulatory concerns, and in at least one instance, millions of dollars in seed money was returned to investors, among them GV and Bain Capital, when the project was cancelled.[9]

41.     Also since 2021, cryptocurrency exchange Kraken has explained to its users the fundamental difference between collateralized stablecoins and uncollateralized algorithmic assets as follows:

What are Stablecoins?

The Beginner's Guide

Stablecoins are a type of cryptocurrency programmed to track the value of another asset like government monies or gold. Many investors are drawn to stablecoins because they offer the efficiency and transparency of cryptocurrencies, while providing relief from the sometimes extreme volatility of these assets. However, traders and investors should note that not all stablecoins are created equal.

[…]

How Do Stablecoins Work?

All stablecoins seek to mimic the price of another asset, but they don't all accomplish this in the same way. This means that some stablecoins may be riskier than others and more prone to the price fluctuations they claim to provide safety from.

---

[9]
https://web.archive.org/web/20211229183210/https://learn.robinhood.com/articles/1thUPqVffWfMYJvxthNrHn/w hat-is-a-cryptocurrency/ (last accessed June 13, 2022).

**FIRST AMENDED CLASS ACTION COMPLAINT; CASE NO. 3:22-CV-03561-MMC**

1

2

[…]

Algorithmic stablecoins are digital assets that rely on smart contracts to regulate their stability. Rather than using deposits of cryptocurrencies or issuing and redeeming debt, the software behind algorithmic stablecoins programmatically adjusts the supply of the cryptocurrency as the demand for it fluctuates. If demand is high, the price of each stablecoin will exceed the intended peg, and the software will increase the supply. Alternatively, if demand is low, the supply will decrease.[10]

42.     Gemini, another cryptocurrency exchange, offers its customers a "cryptopedia," where various digital asset concepts are defined and explained. The section of the cryptopedia titled "What Are Stablecoins?" provides the following information:

There are four primary stablecoin types, identifiable by their underlying collateral structure: fiat-backed, crypto-backed, commodity-backed, and algorithmic.

[…]

Algorithmic stablecoins do not use fiat or cryptocurrency as collateral. Instead, their price stability results from the use of specialized algorithms and smart contracts that manage the supply of tokens in circulation.[11]

43.     Rather than disclose the nature of TerraUSD as uncollateralized, controlled by an algorithm, and highly risky, Coinbase passed it off as just another stablecoin. Its advertising, marketing, promotions, sold and facilitated the sale of TerraUSD on its website and platforms, and categorized it as a stablecoin, which Coinbase itself defined as "pegged to a 'stable' reserve asset,"  despite the fact that TerraUSD was not backed by US dollars or any other tangible asset. The terms "uncollateralized" and "algorithmic" appear nowhere in Coinbase's materials describing TerraUSD. Absent these disclosures, Coinbase never should have described TerraUSD as a stablecoin because it lacked the sole defining characteristic common across stable coins— tangible assets held in reserve. Nonetheless, Coinbase continued to categorize TerraUSD as "a decentralized stablecoin running on Ethereum that attempts to maintain a value of US $1.00."

---

[10] https://web.archive.org/web/20210304131434/https://www.kraken.com/learn/what-are-stablecoins/ (last accessed June 13, 2022).

[11] https://web.archive.org/web/20211109121807/https://www.gemini.com/cryptopedia/what-are-stablecoins-how-do-they-work (last accessed June 13, 2022).

**FIRST AMENDED CLASS ACTION COMPLAINT; CASE NO. 3:22-CV-03561-MMC**

44.     Although Coinbase's website stated that TerraUSD is not "backed by US dollars in a bank account," it failed to explain that TerraUSD is not backed by *any* fiat currency or other tangible asset. This omission is and was material to Plaintiffs and Class Members, and it was misleading because it implied that TerraUSD had benefits and qualities which it did not actually have.

45.     Coinbase's representations about the TerraUSD and its sister coin Luna misled Plaintiffs and Class members into believing that the TerraUSD was inherently stable or, at a minimum, less volatile than traditional cryptocurrencies.

46.     Moreover, Coinbase omitted the fact that TerraUSD's stability—and its ability to maintain a 1:1 peg to the USD—were in fact based on an untested algorithm. This fact was material to Plaintiffs, and they would not have purchased TerraUSD if they had known that its ability to maintain a 1:1 peg was tied to an algorithm rather than tangible assets held in reserve.

47.     Moreover, Coinbase negligently adopted Terraform Labs statements without substantiating whether the anchor protocol was capable of maintaining the value of TerraUSD.

48.     Coinbase also omitted a key connection between itself and TerraUSD's issuer, Terraform Labs.

49.     One of the largest financial backers of Terraform Labs was the investment arm of Coinbase referred to as Coinbase Ventures. Coinbase Ventures is a division of Coinbase dedicated to identifying and funding profitable cryptocurrency ventures. In 2021 and again in 2022, Coinbase Ventures invested millions of dollars in Terraform Labs. Such "interlinkages" between stablecoin issuers and the cryptocurrency exchanges where they are traded was identified as a "risk of particular focus" by the President's Working Group on Financial Markets' "Report on Stablecoins" from November 2021. This link motivated Coinbase to promote and sell TerraUSD without disclosing its volatile nature.

**D. TerraUSD and LUNA Crash**

50.     TerraUSD promoters, such as Coinbase, assured investors that the interplay between Terraform Labs' systems and TerraUSD offered a stable alternative to traditional cryptocurrency investments. As a result, the popularity of TerraUSD grew, and it became "the world's third-biggest stablecoin before it lost its peg to the dollar."[12]

51.     The price of TerraUSD—which was intended to maintain a $1 peg—showed signs of instability on May 7, 2022 and dropped to 35 cents by May 9, 2022.[13] LUNA, the companion token that was supposed to stabilize TerraUSD's price, "fell from $80 to a few cents by May 12."[14] Over $10 billion was wiped out in the collapse.

On May 20, 2022, several sources reported that "South Korean prosecutors are actively investigating whether they could make additional Ponzi scheme charges against Terraform Labs CEO Do Kwon, adding to the complaints already filed against the entrepreneur over Terra's dramatic implosion."

52.     Plaintiffs and Class members incurred damages as a result of Coinbase's actions, including its misrepresentations about the nature and stability of TerraUSD and its material omissions regarding TerraUSD's stability and lack of collateralization.

**PLAINTIFFS' FACTUAL ALLEGATIONS**

53.     Plaintiff PEARL has been a customer of Coinbase since 2019.

54.     In May 2022, Plaintiff PEARL made purchases of TerraUSD on the Coinbase exchange.

55.     At the time of the collapse, Plaintiff PEARL'S total TerraUSD holdings were approximately $13,064.

56.     When TerraUSD collapsed, the value of Plaintiff PEARL'S investment fell in

---

[12] https://markets.businessinsider.com/news/currencies/terrausd-luna-crash-ethereum-vitalik-buterin-do-kwon-stablecoin-crypto-2022-5 (last accessed May 20, 2022).
[13] https://www.coindesk.com/learn/the-fall-of-terra-a-timeline-of-the-meteoric-rise-and-crash-of-ust-and-luna/ (last accessed May 23, 2022).
[14] *Id.*

**FIRST AMENDED CLASS ACTION COMPLAINT; CASE NO. 3:22-CV-03561-MMC**

value by over 90 percent. In addition to financial devastation, the loss of his investment resulted in stress, anxiety, and outrage.

57.     Plaintiff VLADIMIRSKY has been a customer of Coinbase since 2015.

58.     In April 2022, Plaintiff VLADIMIRSKY made purchases of TerraUSD on the Coinbase exchange.

59.     At the time of the collapse, Plaintiff VLADIMIRSKY'S total TerraUSD holdings were approximately $1,462,065.

60.     When TerraUSD collapsed, the value of Plaintiff VLADIMIRSKY'S investment fell in value by over 90 percent. In addition to financial devastation, the loss of his investment resulted in stress, anxiety, and outrage.

## CLASS ACTION ALLEGATIONS

61.     Plaintiffs bring this action on behalf of themselves and the following Classes pursuant to Federal Rule of Civil Procedure 23(a), (b)(2) and (b)(3). Specifically, the Classes are defined as:

> **National Class**: During the fullest period allowed by law, all persons in the United States who purchased or acquired TerraUSD in the United States or its territories and whose transactions of TerraUSD were conducted through Coinbase.
>
> **California Subclass**: During the fullest period allowed by law, all persons in the State of California who purchased or acquired TerraUSD in California and whose transactions of TerraUSD were conducted through Coinbase.

62.     Excluded from the Classes are (a) any person who signed a release of any Defendant in exchange for consideration, (b) any officers, directors or employees, or immediate family members of the officers, directors or employees, of any Defendant or any entity in which a Defendant has a controlling interest, (c) any legal counsel or employee of legal counsel for any Defendant, and (d) the presiding Judge in this lawsuit, as well as the Judge's staff and their immediate family members.

63.     Plaintiffs reserve the right to amend the definition of the Classes if discovery or further investigation reveals that the Classes should be expanded or otherwise modified.

15

64.     **Numerosity – Federal Rule of Civil Procedure 23(a)(1).** Class Members are so numerous and geographically dispersed that joinder of all Class Members is impracticable. While the exact number of Class Members remains unknown at this time, upon information and belief, there are thousands, if not hundreds of thousands, of proposed Class Members. Moreover, the number of members of the Classes may be ascertained from Defendants' books and records. Class Members may be notified of the pendency of this action by mail or electronic mail, which can be supplemented if deemed necessary or appropriate by the Court with published notice.

65.     **Predominance of Common Questions of Law and Fact – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** Common questions of law and fact exist as to all Class Members and predominate over any questions affecting only individual Class Members. These common legal and factual questions include, but are limited to, the following:

    a.   Whether Coinbase owed duties to Plaintiffs and the proposed Class;

    b.   Whether Coinbase breached those duties;

    c.   Whether Coinbase negligently misrepresented TerraUSD to Plaintiffs and the proposed Class;

    d.   Whether Coinbase engaged in unlawful, unfair, or fraudulent business practices in connection with TerraUSD trading on the Coinbase exchange;

    e.   Whether Coinbase's actions and omissions violate California law;

    f.   Whether Coinbase's conduct violates public policy;

    g.   Whether TerraUSD constitutes a security under the federal securities laws;

    h.   Whether Coinbase sold or facilitated the sale or delivery of TerraUSD by interstate means;

    i.   Whether Coinbase made misstatements and omissions in offering documents and communications in connection with the offer or sale of TerraUSD;

    j.   Whether Plaintiffs and members of the proposed Class are entitled to monetary damages and, if so, the nature of such relief; and

16

**FIRST AMENDED CLASS ACTION COMPLAINT; CASE NO. 3:22-CV-03561-MMC**

k.   Whether Plaintiffs and members of the proposed Class are entitled to equitable, declaratory or injunctive relief and, if so, the nature of such relief.

66.     Pursuant to Rule 23(b)(2), Defendants have acted or refused to act on grounds generally applicable to the proposed Class, thereby making final injunctive or corresponding declaratory relief appropriate with respect to the proposed Class as a whole. In particular, Defendants have marketed, advertised, distributed, and facilitated the sale of TerraUSD on the Coinbase platform and such marketing and advertising was materially misleading.

67.     **Typicality – Federal Rule of Civil Procedure 23(a)(3).** Plaintiffs' claims are typical of those of the absent Class Members in that Plaintiffs and the Class Members each purchased TerraUSD on the Coinbase platform and each sustained damages arising from Defendants' wrongful conduct, as alleged more fully herein. Plaintiffs share the aforementioned facts and legal claims or questions with proposed members of the Class, and Plaintiffs and all members of the proposed Class have been similarly affected by Defendants' common course of conduct alleged herein. Plaintiffs and all members of the proposed Class sustained monetary and economic injuries including, but not limited to, ascertainable loss arising out of Defendants' conduct and the subsequent fall in value of TerraUSD.

68.     **Adequacy – Federal Rule of Civil Procedure 23(a)(4).** Plaintiffs will fairly and adequately represent and protect the interests of the members of the proposed Class. Plaintiffs have retained counsel with substantial experience in handling complex class action litigation, including complex questions that arise in this type of consumer protection litigation. Further, Plaintiffs and their counsel are committed to the vigorous prosecution of this action. Plaintiffs do not have any conflicts of interest or interests adverse to those of proposed Class.

69.     **Insufficiency of Separate Actions – Federal Rule of Civil Procedure 23(b)(1).** Absent a class action, Plaintiffs and members of the Classes will continue to suffer the harm described herein, for which they would have no remedy. Even if separate actions could be brought by individual consumers, the resulting multiplicity of lawsuits would cause undue burden

and expense for both the Court and the litigants, as well as create a risk of inconsistent rulings and adjudications that might be dispositive of the interests of similarly situated consumers, substantially impeding their ability to protect their interests, while establishing incompatible standards of conduct for Defendants. Accordingly, the proposed Classes satisfy the requirements of Fed. R. Civ. P. 23(b)(1).

70.   **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2).** Defendants have acted or refused to act on grounds generally applicable to Plaintiffs and all proposed Class Members, thereby making appropriate final injunctive relief and declaratory relief, as described below, with respect to the members of the Classes as a whole.

71.   **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to any other available methods for the fair and efficient adjudication of the present controversy for at least the following reasons:

   a.   The damages suffered by each individual members of the proposed Class do not justify the burden and expense of individual prosecution of the complex and extensive litigation necessitated by Defendants' conduct;

   b.   Even if individual members of the Class had the resources to pursue individual litigation, it would be unduly burdensome to the courts in which the individual litigation would proceed;

   c.   The claims presented in this case predominate over any questions of law or fact affecting individual members of the Class;

   d.   Individual joinder of all members of the Class is impracticable;

   e.   Absent a Class, Plaintiffs and members of the proposed Class will continue to suffer harm as a result of Defendants' unlawful conduct; and

   f.   This action presents no difficulty that would impede its management by the Court as a class action, which is the best available means by which Plaintiffs and

members of the proposed Class can seek redress for the harm caused by Defendants.

72. In the alternative, the Classes may be certified for the following reasons:

a. The prosecution of separate actions by individual members of the Class would create a risk of inconsistent or varying adjudication with respect to individual members of the Class, which would establish incompatible standards of conduct for Defendants;

b. Adjudications of claims of the individual members of the Class against Defendants would, as a practical matter, be dispositive of the interests of other members of the proposed Class who are not parties to the adjudication and may substantially impair or impede the ability of other proposed Class Members to protect their interests; and

c. Defendants have acted or refused to act on grounds generally applicable to the members of the proposed Class, thereby making appropriate final and injunctive relief with respect to the proposed Class as a whole.

**CLAIMS FOR RELIEF**

**COUNT 1**

**Negligence**

**(against Coinbase on behalf of the National Class)**

73. Plaintiffs re-allege and incorporate by reference the allegations contained in the previous paragraphs as though set forth fully herein.

74. Coinbase owed a duty to Plaintiffs and Class members to exercise reasonable care in investigating and monitoring TerraForm Labs and the TerraUSD and in truthfully and accurately describing, defining, marketing, advertising, and selling TerraUSD to its customers. More specifically, this duty included, among other things: (a) conducting due diligence on TerraForm Labs as an issuer and TerraUSD as a stablecoin before listing it on the Coinbase exchange; (b)

testing the TerraUSD token prior to introducing it on the Coinbase exchange to ensure its value would remain stable and pegged to the US dollar; (c) implementing processes that would detect if the TerraUSD became unpegged from US dollar; (d) timely acting upon warnings and alerts regarding the TerraUSD becoming unpegged; and (f) ensuring the truthfulness of its statements made to its users and potential users.

75.     Coinbase's duty to use reasonable care arose from several sources, including but not limited to those described below.

76.     Coinbase had a common law duty to prevent foreseeable harm to others. A duty existed here because it was foreseeable that TerraUSD would become unpegged from the US dollar and that Plaintiffs and Class members would be harmed thereby. Coinbase was aware of the likelihood that the TerraUSD would become unpegged as evidenced by the historical volatility of algorithmic stablecoins, including the Basis Cash, Empty Set, and Iron Finance algorithmic stablecoin, all of which collapsed in 2021. Several other stablecoins have destabilized and ultimately failed, including the SafeCoin, BitUSD, DigitalDollar, NuBits, and CK USD stabelcoins. As such, Coinbase had a duty to exercise reasonable care to prevent these foreseeable harms.

77.     Coinbase's duty also arose under the statutory requirements of California Civil Code § 1714, requiring all "persons," including Coinbase, to act in a reasonable manner toward others.

78.     Coinbase's duty also arose under custom and practice in the cryptocurrency exchange industry, where exchanges consistently disclose the critical distinctions between collateralized stablecoins and uncollateralized algorithmic digital assets like TerraUSD.

79.     Coinbase's duty of care arose under Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, which prohibits "unfair or deceptive acts or practices in or affecting commerce." This includes acts or practices that are likely to cause substantial injury to consumers, which cannot be reasonably avoided by consumers, and which are not outweighed by

countervailing benefits to consumers or competition. It also includes material representations, omissions, or practices that are likely to mislead a reasonable consumer. In addition, individual states have enacted statutes based upon the FTC Act that also created a duty.

80.     Coinbase's duty also arose under Section 200.18(d) of the State of New York Department of Financial Services' Virtual Currency law, under which Coinbase is licensed, and which prohibits "false, misleading, or deceptive representations or omissions" in advertising and marketing materials. 23 CRR-NY § 200.18(d). As an entity engaged in a virtual currency business activity, Coinbase is subject to this duty, along with all other duties imposed by the Virtual Currency Law. See 23 CRR-NY §§ 200.2(q), 200.3(a).

81.     Coinbase's duty also arose from Coinbase's relationship with Plaintiffs and Class members. Coinbase held the unique position as the largest third-party exchange to offer TerraUSD. Because of its critical role within the cryptocurrency exchange market, Coinbase was in a superior position to protect against the harm suffered by Plaintiffs and Class members.

82.     Coinbase breached the duties it owed Plaintiffs and Class members by, among other things, failing to conduct due diligence on Terraform Labs as the issuer and TerraUSD as a stablecoin before listing it on the Coinbase exchange, and failing to test the TerraUSD token prior to introducing it on the Coinbase exchange to ensure the asset would perform consistent with representation made by Terraform Labs and Coinbase, characterizing TerraUSD as a stablecoin backed by reserves, omitting from its materials that TerraUSD was uncollateralized and differentiating it from other collateralized stablecoins, failing to disclose that TerraUSD was an algorithmic stablecoin and therefore more volatile than collateralized stablecoins, and making representations as to TerraUSD's stability and 1-to-1 peg to the US dollar despite a reasonably foreseeable risk that the TerraUSD would become unpegged and cause harms and losses to Plaintiffs and Class members. Coinbase also breached its duties by failing to reasonably act upon warnings and alerts regarding the TerraUSD becoming unpegged.

83.     Coinbase's wrongful actions caused Plaintiffs and the Class to believe that TerraUSD was a collateralized digital asset, as other stablecoins are. These actions also caused Plaintiffs and the Class to believe TerraUSD was a sound investment vehicle and caused them to buy TerraUSD from the Coinbase exchange and hold TerraUSD at the time it collapsed in May 2022. These wrongful actions resulted in Plaintiffs and Class members' damages in the form of monetary losses, time spent attempting to understand and seek recourse for Coinbase's negligent acts, and emotional harm resulting from the sudden, unexpected, and catastrophic losses TerraUSD incurred.

84.     As a direct and proximate cause of Coinbase's negligence, Plaintiffs and Class members have been injured as described herein and are entitled to damages available by law, in an amount to be proven at trial.

## COUNT II

### Negligence *Per Se*

### (on Behalf of the National Class)

85.     Plaintiffs re-allege and incorporate by reference the allegations contained in the previous paragraphs as though set forth fully herein.

86.     Defendants owed Plaintiffs and the Class a statutorily imposed duties, including compliance with Section 5 of the FTC Act and 23 CRR-NY § 200.18(d).

87.     Section 5 of the Federal Trade Commission Act ("FTC Act"), 15 U.S.C. § 45, prohibits "unfair or deceptive acts or practices in or affecting commerce." This prohibition includes acts or practices that are likely to cause substantial injury to consumers, which cannot be reasonably avoided by consumers, and which are not outweighed by countervailing benefits to consumers or competition. It also includes material representations, omissions, or practices that are likely to mislead a reasonable consumer.

88.     Coinbase violated Section 5 of the FTC Act (and similar state statutes) by failing to conduct due diligence on Terraform Labs as an issuer and TerraUSD as a stablecoin before

**FIRST AMENDED CLASS ACTION COMPLAINT; CASE NO. 3:22-CV-03561-MMC**

listing it on the Coinbase exchange, and failing to test the TerraUSD or token prior to introducing it on the Coinbase exchange to ensure the asset would perform consistent with representations made by Terraform Labs and Coinbase, and by listing Terraform on the Coinbase exchange and making representations as to its stability and 1-to-1 peg to the US dollar despite a reasonably foreseeable risk that the TerraUSD would become unpegged and cause harms and losses to Plaintiffs and Class members.

89.     Section 200.18(d) of the New York Virtual Currency Law states that "[i]n all advertising and marketing materials, each licensee and any person or entity acting on its behalf, shall not, directly or by implication, make any false, misleading, or deceptive representations or omissions." 23 CRR-NY § 200.18(d).

90.     Defendants violated Section 200.18(d) of the New York Virtual Currency Law by (i) falsely representing that TerraUSD was a stablecoin backed by "reserve" assets such as fiat currency or commodities and used this reserve to maintain a peg to the US dollar at a 1-to-1 ratio, and therefore constituted a safe investment with virtually no volatility; and (ii) omitting that TerraUSD was in fact an uncollateralized algorithmic digital asset with no reserves of any tangible asset with the propensity to become unpegged from the US dollar, thereby failing to disclose fully and truthfully all material facts regarding the TerraUSD's nature, purpose, value, volatility, and risk.

91.     Defendants' violations of the above cited laws constitute negligence *per se*.

92.     Plaintiffs and Class members are consumers within the class of persons the laws cited above are intended to protect.

93.     Moreover, the harm that has occurred is the type of harm the laws cited above are intended to guard against.

94.     As a direct and proximate result of Defendants' negligence, Plaintiffs and the Class members have been damaged in an amount to be determined at trial.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## COUNT III

### Negligent Misrepresentation

### (on Behalf of the National Class)

95.     Plaintiffs re-allege and incorporate by reference the allegations contained in the previous paragraphs as though set forth fully herein.

96.     Coinbase represented to Plaintiffs and the Class, through its statements and categorizations, that TerraUSD was a "reserve" backed stablecoin that was less volatile than other cryptocurrencies on the market.

97.     Coinbase also represented that the value of TerraUSD would remain pegged to the US dollar at a 1-to-1 ratio, and TerraUSD constituted a safe investment with virtually no volatility. These statements were false.

98.     Defendants also omitted the fact that TerraUSD, as an uncollateralized algorithmic digital assets, had the propensity to become unpegged from the US dollar and, as a result, could become worthless. In doing so, Defendants misrepresented material facts regarding TerraUSD stablecoin's nature, purpose, value, volatility, and risk. These omissions rendered Defendants' affirmative representations deceptive and likely to mislead potential purchasers.

99.     Defendants failed to conduct reasonable and diligent investigation of the representations they made to Plaintiffs and the Class to ensure that those statements were true and that there was no omission of material facts required to make the representations not misleading. Defendants, in the exercise of reasonable care, should have known its statements and omissions were misleading. For example, Defendants knew that it was improper to categorize TerraUSD as a stablecoin when, in all reality, it was not collateralized with tangible assets.

100.     Defendants owed a duty to Plaintiffs and Class members to speak with care and explain fully and truthfully all material facts regarding the TerraUSD. This duty arose from several bases, including Section 5 of the FTC Act, which prohibits "deceptive acts or practices in or

affecting commerce." This provision encompasses material representations, omissions, or practices that are likely to mislead a reasonable consumer.

101.    Defendants' duty to speak truthfully and with care also arose under Section 200.18(d) of the State of New York Department of Financial Services' Virtual Currency law, which prohibits "false, misleading, or deceptive representations or omissions" in advertising and marketing materials. 23 CRR-NY § 200.18(d). As entities engaged in virtual currency business activities, Defendants are subject to this duty, along with all other duties imposed by the Virtual Currency Law. *See* 23 CRR-NY §§ 200.2(q), 200.3(a).

102.    Coinbase's duty to speak with care arose from their special relationship with Plaintiffs and Class members and its unique position as a broker-dealer. Because of its critical role within the cryptocurrency exchange market, Coinbase was in a superior position to protect against the harm suffered by Plaintiffs and Class members. Additionally, Coinbase's duty to disclose arose from its privity relationship with Plaintiffs and Class members.

103.    The above-described relationship between Defendants and Plaintiffs is such that, in morals and good conscience, Plaintiffs and the Class had the right to rely upon Defendants for information. Defendants were in a special position of confidence and trust with Plaintiffs and the Class such that their reliance on Defendants' negligent misrepresentations was justified.

104.    Defendants knew, or reasonably should have known, that Plaintiffs and the Class would rely on its misrepresentations and omissions in purchasing TerraUSD.

105.    Defendants' negligent misrepresentations and omissions, upon which Plaintiffs and Class members reasonably and justifiably relied, were intended to induce, and actually induced, Plaintiffs and Class members to purchase TerraUSD.

106.    As a direct and proximate cause of their reliance on Defendants' representations, Plaintiffs and Class members have been injured as described herein and are entitled to damages available by law, in an amount to be proven at trial.

**COUNT IV**
**California's Unfair Competition Law**
**Cal. Bus. & Prof. Code § 17200 et seq. ("UCL")**
**(on Behalf of the California Subclass)**

107. Plaintiffs re-allege and incorporate by reference the allegations contained in the previous paragraphs as though set forth fully herein.

108. The UCL prohibits any "unlawful, unfair or fraudulent business act or practice." Cal. Bus. & Prof. Code § 17200, et seq.

109. The acts, omissions, misrepresentations, practices, and non-disclosures of Defendants as alleged herein constitute business acts and practices.

110. **Unlawful**: The acts alleged herein are "unlawful" under the UCL in that they violate at least the following laws:

- Section 1714 of the California Civil Code;

- Section 5 of the FTC Act;

- Section 200.18(d) of the State of New York Department of Financial Services' Virtual Currency law

111. **Unfair**: Defendants' conduct with respect to the labeling, advertising, and sale of TerraUSD was "unfair" because Defendants' conduct was immoral, unethical, unscrupulous, or substantially injurious to consumers and the utility of their conduct, if any, does not outweigh the gravity of the harm to their victims.

112. Defendants' conduct with respect to the labeling, advertising, and sale of TerraUSD was and is also unfair because it violates public policy as declared by specific constitutional, statutory or regulatory provisions, including but not limited to the applicable sections of the federal Securities Act.

113. Defendants' conduct with respect to the labeling, advertising, and sale of TerraUSD was and is unfair because the consumer injury was substantial, not outweighed by benefits to consumers or competition, and not one consumer themselves could reasonably have avoided.

**FIRST AMENDED CLASS ACTION COMPLAINT; CASE NO. 3:22-CV-03561-MMC**

114.     **Fraudulent**: A statement or practice is "fraudulent" under the UCL if it is likely to mislead or deceive the public, applying an objective reasonable consumer test.

115.     As set forth herein, Defendants' representations regarding the stability of TerraUSD are likely to mislead reasonable consumers to believe the claims of TerraUSD's stability are true.

116.     Defendants profited from the sale of the falsely, deceptively, and unlawfully advertised TerraUSD.

117.     Defendants' conduct caused and continues to cause substantial injury to Plaintiffs and the other Class Members. Defendants continue to publish misleading characterizations of stablecoins, including the TerraUSD. Plaintiffs have suffered injury in fact as a result of Defendants' unlawful conduct.

118.     In accordance with Bus. & Prof. Code § 17203, Plaintiffs seek an order enjoining Defendants from continuing to conduct business through unlawful, unfair, and fraudulent acts and practices, and to commence a corrective advertising campaign explaining the critical distinctions between collateralized stablecoins and uncollateralized algorithmic digital assets like TerraUSD, which is custom and practice in the cryptocurrency exchange industry.

119.     Plaintiffs and the Class also seek an order for and restitution of all monies from the sale of TerraUSD, which were unjustly acquired through acts of unlawful competition, and any other relief allowed under the UCL, including interest and attorneys' fees pursuant to, *inter alia*, Code of Civil Procedure § 1021.5, and to such other and further relief as this Court may deem just and proper.

## COUNT V
### California's False Advertising Law
### Cal. Bus. & Prof. Code § 17500, et seq. ("FAL")
### (on Behalf of the California Subclass)

120.     Plaintiffs repeat and reallege the allegations in the previous paragraphs as if fully set forth herein. Plaintiffs bring this cause of action against Defendants individually and on behalf of the California Subclass.

121.   The conduct described herein took place within the state of California and constitutes deceptive or false advertising in violation of California Business and Professions Code §§ 17500, et seq.

122.   California Business and Professions Code §§ 17500, et seq. prohibits deceptive or misleading practices in connection with advertising or representations made for the purpose of inducing, or which are likely to induce, consumers to purchase products.

123.   It is also unlawful under the FAL to disseminate statements concerning property or services that are "untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." *Id.*

124.   Defendants violated the FAL when they marketed, advertised, and promoted exchange services in connection with TerraUSD by: (1) misleading Plaintiffs and Class members about the benefits of TerraUSD, (2) omitting material facts about the volatility and risks of TerraUSD, and (3) mischaracterizing TerraUSD as a stablecoin when it lacks the qualities and benefits of a stablecoin.

125.   At the time of their misrepresentations and omissions, Defendants were either aware of the risks of mischaracterizing TerraUSD as a stablecoin or they were aware that they lacked the information and knowledge required to truthfully make this representation.

126.   Plaintiffs have standing to pursue claims under the FAL because they reasonably reviewed and relied on Coinbase's statements when purchasing or exchanging TerraUSD on Coinbase.

127.   In reliance on the statements made in Coinbase's advertising and marketing materials, and Coinbase's omissions and concealment of material facts regarding the quality and characteristics of TerraUSD, Plaintiffs and members of the California Subclass purchased or exchanged TerraUSD on Coinbase.

128.   Had Coinbase disclosed the true nature and characteristics of TerraUSD, Plaintiffs and members of the California Subclass would not have purchased TerraUSD.

**FIRST AMENDED CLASS ACTION COMPLAINT; CASE NO. 3:22-CV-03561-MMC**

129.     As a direct and proximate result of Defendants' actions, as set forth herein, Defendants have received ill-gotten gains and profits.

130.     As a result, Plaintiffs, the California Subclass members, and the general public are entitled to injunctive and equitable relief, restitution, and an order for the disgorgement of the funds by which Defendants were unjustly enriched.

131.     Pursuant to Cal. Bus. & Prof. Code § 17535, Plaintiff, on behalf of himself and the California Subclass, seeks an order enjoining Defendants from continuing to engage in deceptive business practices, false advertising, and any other act prohibited by law, including those set forth in this Complaint.

**<u>COUNT VI</u>**
**California's Consumer Legal Remedies Act**
**Cal. Civ. Code § 1750, et seq. ("CLRA")**
**(on Behalf of the California Subclass)**

132.     Plaintiffs repeat and reallege the allegations in the previous paragraphs as if fully set forth herein. Plaintiffs bring this cause of action against Defendants individually and on behalf of the California Subclass.

133.     The conduct described herein took place in the state of California and constitutes unfair methods of competition or deceptive acts or practices in violation of the Consumers Legal Remedies Act ("CLRA"), Civil Code §§ 1750, et seq.

134.     The CLRA applies to all claims of all members of the California Subclass because the conduct which constitutes violations of the CLRA by Defendants occurred within the state of California.

135.     Plaintiffs and members of the California Subclass are "consumers" as defined by Civil Code § 1761(d) because they purchased TerraUSD using Coinbase's services, and did so for personal, family, or household purposes.

136.     Defendants are "person[s]" as defined by Civil Code § 1761(c).

137.     Plaintiffs and California Subclass members' purchases of TerraUSD on Coinbase's platforms are "transactions" as defined by Civil Code § 1761(e).

29

**FIRST AMENDED CLASS ACTION COMPLAINT; CASE NO. 3:22-CV-03561-MMC**

138.    The CLRA prohibits deceptive practices in connection with the conduct of a business that provides goods, property, or services primarily for personal, family, or household purposes.

139.    Defendants' false and misleading policies, acts, and practices were designed to, and did, induce the Plaintiffs and Class members to purchase and exchange TerraUSD, and violated the following sections of the CLRA:

   a.   § 1770(a)(5): representing that goods, property, and services have sponsorship, approval, characteristics, uses, or benefits which they do not have;

   b.   § 1770(a)(7): representing that goods, property, and services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;

   c.   § 1770(a)(9): advertising goods, property, and services with intent not to sell them as advertised; and

   d.   § 1770(a)(16): representing the subject of a transaction has been supplied in accordance with a previous representation when it has not.

140.    Defendants engaged in unfair competition or unfair or deceptive acts or practices in violation of Civil Code §§ 1770(a)(5)-(16) by: (1) characterizing TerraUSD as a stablecoin although it lacks the hallmarks of a stablecoin, and Coinbase is aware of this fact; (2) representing that TerraUSD had benefits or characteristics that it did not actually have; and (3) omitting material facts about TerraUSD.

141.    Defendants profited by selling TerraUSD to unwary consumers through the use of false, deceptive, misleading, and unlawful advertising.

142.    Defendants' wrongful business practices constituted, and constitute, a continuing course of conduct in violation of the CLRA.

**FIRST AMENDED CLASS ACTION COMPLAINT; CASE NO. 3:22-CV-03561-MMC**

143.     Plaintiffs have complied with the requirements of California Civil Code section 1782 and attach herewith as Exhibit 1 a true and correct copy of their letter of June 24, 2022 (omitting enclosure, which consisted of Plaintiffs' original complaint, Dkt. 2), sent to Defendants via certified mail. This letter provided Defendants with written notice of the specific provisions of the CLRA Plaintiffs allege have been violated and demanded that Defendants correct such violations. The statutory 30-day notice and cure period has expired. Defendants have declined or failed to correct, repair, replace, or otherwise rectify the goods or services at issue. Therefore, pursuant to California Civil Code section 1782(d), Plaintiffs hereby add claims for monetary relief, including restitution as well as actual, punitive and statutory damages, as appropriate, under the CLRA.

144.     Pursuant to California Civil Code section 1780(d), attached hereto as Exhibits 2 and 3 are declarations on behalf of Plaintiffs Larry Pearl and Eric Vladimirsky, respectively, showing that this action has been commenced in the proper forum.

145.     As a result of Defendants' violations, and pursuant to California Civil Code § 1780, Plaintiffs and the Class seek actual, statutory, and punitive damages, as well as restitution, in accordance with proof at trial. Plaintiffs also seek injunctive relief, including a court order enjoining the above-described wrongful acts and practices of Defendants, reasonable attorneys' fees and costs pursuant to California Civil Code section 1780(e), and such other and further relief as this Court may deem just and proper.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, individually and on behalf of all other similarly situated members of the Classes, pray for relief and judgment, including entry of an order:

A. Declaring that this action is properly maintained as a class action, certifying the proposed Class, appointing Plaintiffs as Class Representatives and appointing Plaintiffs' counsel as Class Counsel;

B. Directing that Defendants bear the costs of any notice sent to the Class;

C. Declaring that Defendants must disgorge, for the benefit of the Class, all or part of the ill-gotten profits they received from the exchange of TerraUSD, or order Defendants to make full restitution to Plaintiffs and the members of the Class;

D. Awarding restitution and other appropriate equitable relief;

E. Granting an injunction against Defendants to enjoin them from conducting their business through the unlawful, unfair, and fraudulent acts or practices set forth herein;

F. Ordering a jury trial and damages according to proof;

G. Awarding Plaintiffs and members of the Class actual and statutory damages, as provided by the applicable state consumer protection statutes invoked above;

H. Awarding attorneys' fees and litigation costs to Plaintiffs and members of the Class;

I. Awarding civil penalties, prejudgment interest and punitive damages as permitted by law; and

J. Ordering such other and further relief as the Court deems just and proper.

## <u>JURY DEMAND</u>

Plaintiffs demand a trial by jury of all claims in this Complaint so triable.

Dated: September 9, 2022                    Respectfully submitted,

                                            */s/ Trenton R. Kashima*
                                            Trenton R. Kashima (SBN 291405)
                                            **MILBERG COLEMAN BRYSON**
                                            **PHILLIPS GROSSMAN PLLC**
                                            401 West C St., Suite 1760
                                            San Diego, CA 92101
                                            Tel: (714) 651-8845
                                            tkashima@milberg.com

                                            Nick Suciu, *admitted pro hac vice*
                                            **MILBERG COLEMAN BRYSON PHILLIPS**
                                            **GROSSMAN PLLC**
                                            6905 Telegraph Rd., Suite 115
                                            Bloomfield Hills, MI 48301
                                            Tel: (313) 303-3472
                                            Email: nsuciu@milberg.com

32

Gary Klinger, *admitted pro hac vice*
Russell Busch*
**MILBERG COLEMAN BRYSON PHILLIPS
GROSSMAN PLLC**
227 W. Monroe Street, Suite 2100
Chicago, IL 60606
Tel.:    (866) 252-0878
Email: gklinger@milberg.com
                rbusch@milberg.com
*Pro Hac Vice* Application Forthcoming

Julie Erickson (SBN 293111)
Elizabeth Kramer (SBN 293129)
Kevin Osborne (SBN261367)
**ERICKSON KRAMER OSBORNE LLP**
44 Tehama Street
San Francisco, CA 94105
Tel: (415) 635-0631
Email:  julie@eko.law
            elizabeth@eko.law
            kevin@eko.law

*Attorneys for Plaintiffs and the Class*

**FIRST AMENDED CLASS ACTION COMPLAINT; CASE NO. 3:22-CV-03561-MMC**