Julie Erickson, State Bar No. 293111 (julie@eko.law)
Elizabeth Kramer, State Bar No. 293129 (elizabeth@eko.law)
Kevin Osborne, State Bar No. 261367 (kevin@eko.law)
**Erickson Kramer Osborne LLP**
959 Natoma Street
San Francisco, CA 94103
Phone: 415-635-0631
Fax: 415-599-8088

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| LARRY PEARL, individually and on behalf of all others similarly situated, | Case No.: Case No.: 3:22-cv-03561-MMC |
| Plaintiff, | |
| vs. | FOURTH AMENDED CLASS ACTION COMPLAINT: |
| COINBASE INC., | 1. Negligent Misrepresentation |
| Defendant. | 2. Violation of Cal. Bus. & Prof. Code §§ 17200, *et seq.* |
| | 3. Violation of Cal. Bus. & Prof. Code §§ 17500, *et seq.* |
| | 4. Violation of Cal. Corp. Code §§ 25110 and 25503 |
| | 5. Violation of Cal. Corp. Code § 25401 and 25501 |
| | 6. Violation of Cal. Corp. Code §§ 25130 and 25503 |
| | 7. Violation of Cal. Corp. Code §§ 25400(d) and 25500 |
| | **JURY TRIAL DEMANDED** |

## CLASS ACTION COMPLAINT

Plaintiff, LARRY PEARL ("Plaintiff"), on behalf of himself and all others similarly situated, brings this class action against Defendant Coinbase Inc. ("Coinbase" or "Defendant"), and alleges on personal knowledge, investigation of his counsel, and on information and belief as follows:

## I.    INTRODUCTION

1.    Since Bitcoin launched in 2008, the cryptocurrency market has grown to include over 6,000 digital currencies and other financial instruments that are used by millions of Americans.[1] One such cryptocurrency token is TerraUSD, also referred to as "UST," a cryptocurrency token issued by Singapore-based Terraform Labs PTE Ltd. ("Terraform Labs"). UST is a security under federal Securities Laws. However, Terraform Labs never registered UST as a security with the U.S. Securities Exchange Commission, nor listed it on a national securities exchange.

2.    Coinbase holds itself out as a centralized marketplace for cryptocurrency traders. It is also a significant venture capital investor in early-phase cryptocurrency companies and one of the largest financial backers of Terraform Labs. In 2021, Terraform Labs used exchanges, including Coinbase, to create markets where UST could be traded. Terraform Labs' partnership with Coinbase allowed it to issue UST tokens to more investors and generated commissions and other profits for Coinbase.

3.    Coinbase promoted and categorized the UST cryptocurrency token as a "stablecoin"—a distinct type of cryptocurrency that is far less volatile than its non-pegged counterparts. Stablecoins differ from other cryptocurrencies, such as Bitcoin, in that their value is pegged to that of another traditional reserve asset, currency, or commodity. When they were first introduced to the market in or around 2020, virtually all stablecoins were designed to maintain their "pegged value" through collateralization, meaning they were backed by an underlying tangible asset held in reserve. As time went on, different types of stablecoins emerged onto the market, backed by different mechanisms aiming to maintain their peg.

---

[1] Total market capitalization for the 11,000 digital asset tokens in existence is over $1.5 trillion.

4.      UST was marketed as a stablecoin that is "pegged" to the United States dollar ("USD") at a rate of one-to-one. That is, UST was designed to maintain a value of $1.00 per coin. Because it was purportedly "pegged" to a government-issued currency, and specifically the world's reserve currency, it was marketed as a type of investment that could "virtually eliminate volatility."

5.      In reality, UST was not backed by any tangible assets held in reserve and lacked the qualities and characteristics which distinguish stablecoins from other types of cryptocurrencies. UST's value was actually dependent on an experimental algorithm tethered to its volatile sister cryptocurrency, LUNA. LUNA had a history of fluctuating and even crashing in value. This caused other Terra stablecoins tethered to the LUNA to drop below their pegged value and made it highly likely, if not certain, that UST would similarly suffer a break from its peg. Coinbase knew all of this but concealed these material facts from consumers.  Exacerbating these omissions, Coinbase promoted UST as pegged one-to-one to the US dollar and affirmatively misrepresented to consumers that, as a stablecoin, UST was "free from the volatility of non-pegged cryptocurrencies." This representation was demonstrably false. Relying on these representations and in the dark about UST's true nature (concealed by Coinbase), Plaintiff and Class Members invested in UST via Coinbase's exchange.

6.      On May 8, 2022, UST started losing value. Within weeks, both UST and LUNA became practically worthless.

7.      When the value of UST plummeted in May of 2022, investors, including Plaintiff and Class Members, lost an estimated $18 billion in a matter of days.

8.      Around the time of the May 2022 collapse, over $2 billion US worth of UST were "unstaked" or removed from the Anchor Protocol, one of the mechanisms Terraform Labs claimed would bring about a stable 1:1 US dollar conversion rate. Next, mass quantities of UST were immediately sold and, as UST started losing its value, risk-averse investors rushed to sell. The LUNA-based algorithm failed, and, by May 19, 2022, the value of UST had dropped below $0.08.

**FOURTH AMENDED CLASS ACTION COMPLAINT: CASE NO. 3:22-CV-03561-MMC**

9.    In February 2023, the U.S. Securities and Exchange Commission ("SEC") alleged that UST was being traded as an unregistered security in violation of section 12 of the Securities Act. Multiple federal courts have agreed, ruling that UST was, indeed, a security as a matter of law. Coinbase knew or reasonably should have known that UST was an unregistered security at the time it listed UST on its exchange and at the time of the crash.

10.    Coinbase used the promotional statements described above and additional statements in a variety of media to solicit investment into UST. By soliciting investment, it is liable under California's securities laws as a statutory secondary seller and/or non-issuer of an unregistered security.

11.    Coinbase is in the business of encouraging investors to buy cryptocurrencies. It profited from every sale and trade of UST made on its platforms. However, Coinbase did not disclose to investors, including Plaintiff, that UST was an unregistered security that could not be traded on its exchange. Moreover, Coinbase spent millions backing UST and had a vested interest in its success. It also performed extensive internal assessments of UST, LUNA, and other Terra ecosystem products, which reviewed, among other things, the inner workings of each token, the history and any red flags associated with the Terraform Labs team, and other factors that might defraud or harm consumers. As a result, Coinbase knew the true nature of UST, LUNA, and the overall Terra ecosystem but deliberately withheld the true nature of and the risks inherent to these products, which were inextricably linked to one another. These omissions and false representations misled Plaintiff and Class members to reasonably believe that they were purchasing was a stablecoin pegged to the US dollar and *not* dependent or subject to the fluctuations of some other non-pegged cryptocurrency.

12.    As a result of Coinbase's conduct, Plaintiff and Class members have been damaged. Accordingly, Plaintiff, individually and on behalf of all persons or entities who transacted in UST on Coinbase during the Class Period (the "Class"), brings claims for equitable relief and to recover damages.

## II.   THE PARTIES

13.   Plaintiff LARRY PEARL is and at all relevant times was a citizen of California residing in Huntington Beach, California.

14.   Defendant Coinbase Inc. is a Delaware corporation headquartered in San Francisco, California and is a wholly-owned subsidiary of Coinbase Global, Inc. Coinbase created and operates a website from which customers can buy and sell digital assets – the Coinbase platform, on which UST was traded.

15.   Plaintiff reserves the right to amend this Complaint to add different or additional defendants, including without limitation any officer, director, employee, supplier, or distributor of Defendant who has knowingly and willfully aided, abetted, or conspired in the false and deceptive conduct alleged herein

## III.   JURISDICTION AND VENUE

16.   This Court has general jurisdiction over Defendant because Coinbase is headquartered in California. Further, this Court has specific jurisdiction for the claims set forth herein because it has, at all times relevant to this matter, individually or through its agents, subsidiaries, officers or representatives, operated, conducted, engaged in and carried on a business venture in this state and maintained an office or agency in this state, and marketed, advertised, distributed and sold products in this state, committed a statutory violation within this state related to the allegations made herein, directed at consumers in this state, and caused injuries to Plaintiff and proposed Class Members, which arose out of the acts and omissions that occurred in the state of California, during the relevant time period, at which time Defendant was engaged in business activities in the state of California.

17.   This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C.§ 1332 of the Class Action Fairness Act of 2005 because: (i) there are 100 or more proposed Class Members, (ii) the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs, and (iii) there is minimal diversity because a substantial number of proposed Class Members are citizens of states different from Defendant. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

FOURTH AMENDED CLASS ACTION COMPLAINT: CASE NO. 3:22-CV-03561-MMC

18.     Pursuant to 28 U.S.C. § 1391(b)(1), venue is proper because Coinbase is headquartered in this District. Venue is also proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to the claims asserted occurred in this District. Venue is also proper pursuant to 28 U.S.C. § 1391(c) because Defendant conducts substantial business in this District, has sufficient minimum contacts with this District, and otherwise purposely avails itself of the markets in this District, through the promotion, sale, and marketing of digital assets in this District.

19.     The acts and practices complained of herein emanated from Defendant's headquarters in California. Defendant's decisions to offer UST on Coinbase and its related marketing of UST were contemplated and made at its California headquarters with the approval and direction of its officers and executives in California.

20.     California's substantive laws may be constitutionally applied to the claims of Plaintiff and the Class under the Due Process Clause, 14th Amend. § 1, and the Full Faith and Credit Clause, Art. IV § 1, of the U.S. Constitution. California has significant contact, or significant aggregation of contacts, to the claims asserted by Plaintiff and all Class members, thereby creating state interests that ensure that the choice of California state law is not arbitrary or unfair.

21.     The application of California laws to the Class is also appropriate under California's choice of law rules because California has significant contacts to the claims of Plaintiff and the Class, and California has a greater interest in applying its laws here than any other interested state.

## IV.    FACTS COMMON TO ALL CLASS MEMBERS

### A. Terraform Labs's Ecosystem: UST, LUNA, and the Anchor Protocol

22.     Cryptocurrency is a type of digital asset originally intended to serve as a medium of exchange designed to work like fiat currency but without the control or oversight of a centralized government authority.

23.     The inception of cryptocurrency was lauded as an end to banks and centralized currency because it offers the same anonymity as physical cash. Despite its potential, cryptocurrency has

FOURTH AMENDED CLASS ACTION COMPLAINT: CASE NO. 3:22-CV-03561-MMC

1  yet to deliver on its promise to end traditional banking. Moreover, as compared to fiat currency,
2  such as the US dollar or euro, the value of cryptocurrency is highly volatile, with many of the
3  top-traded cryptocurrencies fluctuating more than 100 percent in value in a single year.

4  24.     In 2014, several companies started issuing "stablecoins" which, as the name suggests,
5  are intended to add stability to an otherwise volatile cryptocurrency market. Many of the early
6  stablecoin experiments failed.

7  25.     Stablecoins differ from other cryptocurrencies because their value is "pegged," or tied,
8  to that of another currency, commodity, or financial instrument. With respect to traditional
9  stablecoins, for each coin issued, the issuer maintains its pegged value by holding an equal
10 amount of underlying hard assets in reserve as collateral. Stated differently, these stablecoins
11 are "collateralized" because they are backed by an underlying tangible asset. This was the
12 established definition of "stablecoin" in the cryptocurrency industry, understood by reasonable
13 consumers of cryptocurrencies, during the period of time leading up to the May 2022 UST
14 crash. Traditional *cryptocurrencies*, however, are generally "uncollateralized," and their value
15 is based on the market for the asset itself, contributing to their high volatility.

16 26.     In or around 2018, Terraform Labs developed and launched a system of cryptocurrencies
17 known as "the Anchor Protocol." One of the cryptocurrencies in the Anchor Protocol was UST,
18 which purported to maintain a one-to-one peg in value with the U.S. dollar. To benefit from
19 UST, investors would "stake" their holdings in the Anchor Protocol. Staking involved
20 depositing UST into the Anchor Protocol, where it was locked up in exchange for high yields
21 (interest), most notably up to 20% annual returns.

22 27.     The Anchor Protocol offered an enticing deal. Rather than speculating on the boom-or-
23 bust cryptocurrency market, UST investors could grow wealth through savings account-style
24 interest yields. This security led retail and institutional investors to flock to the Anchor Protocol
25 and invest hundreds of millions of dollars of capital in Terraform Labs.

26 28.     However, despite being characterized as a stablecoin, UST was not backed by actual
27 U.S. dollars or any other currency or tangible asset held in reserve.

28

**FOURTH AMENDED CLASS ACTION COMPLAINT: CASE NO. 3:22-CV-03561-MMC**

29.     In reality, UST was designed to keep its peg to the dollar through an experimental algorithm dependent on another Terraform Labs-issued cryptocurrency called LUNA. In theory, an investor in UST could always exchange one UST for $1.00 worth of LUNA, and vice versa, using a mint-and-burn mechanism that automatically adjusted supply. When UST's price rose above $1.00, users could profit by burning LUNA to mint new UST, increasing supply and lowering the price, while if UST fell below $1.00, holders could burn UST for LUNA, reducing UST supply and raising the price.

30.     Terraform Labs benefitted from the growth of its ecosystem, the Anchor Protocol, and rising value of Luna, and Coinbase benefitted from commissions made on each UST and Luna transaction it executed. Coinbase also benefitted from Terraform Lab's success because it was a significant investor in the company.

## B. UST Is a Security Under Federal Law

31.     UST is a security under the federal Securities Laws. Under Section 2(a)(1) of the Securities Act of 1933, "investment contracts" are securities. An "investment contract" is "an investment of money in a common enterprise with profits to come solely from the efforts of others." *SEC v. W.J. Howey Co.*, 328 U.S.293, 301 (1946). The Ninth Circuit has distilled that test into three parts: (1) an investment of money; (2) in a common enterprise; (3) with an expectation of profits produced by the efforts of others." *Warfield v. Alainz*, 569 F.3d 1015, 1020 9th Cir. 2009).

32.     The listing of UST on Coinbase allowed retail investors to purchase UST with both traditional and digital currencies. Plaintiff and other Class Members invested fiat currencies, including U.S. dollars, and digital currencies such as Bitcoin and Ethereum, to purchase UST on the Coinbase exchange.

33.     Investors in UST, such as Plaintiff and Class Members, were part of a common enterprise. The fortunes of UST investors were tied to one another and to those of Terraform Labs and its founder and Chief Executive Officer, Do Kwon.[2]

---

[2] Terraform Labs was founded by Do Kwon and Daniel Shin in 2018 and is a Seoul, South Korea-based internet services industry company.

FOURTH AMENDED CLASS ACTION COMPLAINT: CASE NO. 3:22-CV-03561-MMC

34.     Plaintiff and other UST investors (including Class Members) purchased UST with a reasonable expectation of profit from the efforts of Terraform Labs, Kwon, and others. Investors purchased UST to make a profit and accumulate additional UST from various rewards programs (including interest for "staking" the tokens) rather than to use UST themselves for any task. In addition, Plaintiff's and UST investors' expected profits were based on the managerial and entrepreneurial efforts of Terraform Labs and Mr. Kwon.[3]

35.     As a standard practice, Coinbase conducted extensive reviews of any asset that applied to be listed on Coinbase's exchange. These reviews consisted of three primary categories, one of which was legal compliance, i.e., whether the asset was a security under the *Howey* test. Coinbase asserted that, as a core policy, it does not list assets on its exchange that are securities. Coinbase performed this evaluation of UST, LUNA, and Terraform's Ethereum-based equivalent of LUNA, known as "Wrapped Luna" (WLUNA). Based on the information available to it at the time of its reviews of the relevant Terra ecosystem products, Coinbase knew or should have known that UST and WLUNA were securities.

### C. UST is a Security under California Law

36.     California's definition of a "security" was modeled after Section 2(a)(1) of the Securities Act of 1933 and includes some 23 instruments meeting the definition, such as "any note; stock; treasury stock; . . . certificate of interest or participation in any profit-sharing agreement; . . . transferable share; [and] investment contract." Cal. Corp. Code § 25019. Court decisions interpreting the scope of the definition of a "security" under the Securities Act of 1933 are persuasive authority under the California statute, and courts have interpreted the term "security" to be synonymous in scope with the term "investment contract" in federal securities law cases. *See* 1 Marsh & Volk, PRACTICE UNDER THE CALIFORNIA CORPORATE SECURITIES LAWS § 5.19[1][b], [d] (2019).

---

[3] For a more-detailed discussion of Terraform Labs' and Kwon's statements regarding UST as an investment that could result in profit, *see SEC v. Terraform Labs*, No. 23-cv-1346 (JSR), 2023 WL 8944860, at *13-14 (S.D.N.Y., Dec. 28, 2023).

1    37.    In addition to meeting the definition of a "security" under the SEC Framework and the

2    federal *Howey* test, UST also satisfies the four elements of the "risk capital test" as articulated

3    by the California Supreme Court in *Silver Hills Country Club v. Sobieski*, 55 Cal. 2d 811, 815

4    (1961) ("*Silver Hills*") to qualify as a "security" under California law.

5    38.    California courts have held that both the *Silver Hills* and *Howey* tests may be applied,

6    either separately or together, to determine whether a transaction is a security under California

7    law. In other words, a transaction is a security if it satisfies either test. *People v. Black*, 8 Cal.

8    App. 5th 889, 900 (2007) (holding that California "proceed[s] under the framework of both

9    tests, either separately or together"); *Consol. Mgmt. Grp., LLC v. Dep't of Corporations*, 162

10   Cal. App. 4th 598, 610 (2008) (same); *People v. Schock*, 152 Cal. App. 3d 379 (1984) (both

11   tests applied, and transaction held to be a security under federal test); *People v. Smith*, 215 Cal.

12   App. 3d 230, 237 (while California courts often use the risk capital test for defining a security,

13   it is "a general test, and is not applicable in all situations. Federal definitions of securities are

14   also used in California when appropriate in determining whether an investment vehicle is a

15   security. . . .").

16   39.    As investors in UST, Plaintiff and the Class who purchased UST maintained a passive

17   position based on the success of UST in the marketplace in that they were substantially

18   powerless to affect the market value of UST. Any money Plaintiff and the Class invested in

19   UST was also substantially at risk because it was inadequately secured.

20   40.    This is because the success of UST was dependent on the conduct of others, and

21   Plaintiff's and UST investors' expected profits were based on the managerial and

22   entrepreneurial efforts of Terraform Labs and Mr. Kwon, as described above.

23       **D. Coinbase Categorized UST as a "Stablecoin," Promoted the Asset, and Offered UST**

24       **for Sale on Its Trading Platforms**

25   41.    When Coinbase offers trading of a cryptocurrency, it publicly posts information

26   regarding the asset, including a description of the asset and which Coinbase products support it

27   (i.e. Coinbase, Coinbase Pro, or Coinbase Wallet). In a separate branch of the Coinbase website

28   referred to as "Price charts," Coinbase provides historical data regarding the asset, including the

1  asset's historical pricing, trading activity, market cap, and the number of times the asset has

2  been mentioned on social media in recent days. Coinbase users, including Plaintiff and Class

3  Members, reasonably relied on this and other Coinbase-authored information in reaching their

4  purchase decisions regarding UST.

5  42.    Coinbase also offers educational resources for its customers to learn about the

6  fundamentals of cryptocurrencies. Since 2021, and as of the present date, Coinbase has defined

7  stablecoins to its customers on a page of its website titled, "What is a stablecoin?"[4] From 2021

8  until at least January 23, 2024, this page defined a stablecoin as "a digital currency that is

9  pegged to a 'stable' reserve asset like the U.S. dollar or gold." It further stated,

10  "[s]tablecoins are free from the volatility of non-pegged cryptocurrencies."

11  43.    Simultaneously, the Coinbase "TerraUSD Price" page represented UST to be a

12  "stablecoin," with a price of $1.00.[5]

13  44.    Coinbase's definition of a stablecoin during the relevant period omitted critically

14  important facts about the family of digital assets that were marketed by Coinbase as stablecoins.

15  Chiefly, the definition failed to inform customers not all stablecoins use "reserve" assets to

16  maintain a peg. It also omitted that some digital assets that are referred to as "stablecoins" are

17  uncollateralized by any reserve asset and are instead designed to maintain a peg through an

18  algorithm. In the relevant time period of 2021-2022, based on this definition and the relative

19  newness of stablecoins (especially algorithmic stablecoins), reasonable consumers of

20  cryptocurrency did not expect that digital assets like UST marketed as unqualified "stablecoins"

21  would, in reality, attempt to maintain their pegged value through an algorithm dependent on a

22  volatile cryptocurrency. This is especially so given that nowhere in Coinbase's materials

23  describing UST did the words "algorithmic" or "uncollateralized" appear.

24

---

25  [4] https://web.archive.org/web/20211023101553/https://www.coinbase.com/learn/crypto-
26  basics/what-is-a-stablecoin (last accessed March 22, 2024); *accord*
    https://web.archive.org/web/20240123232915/https://www.coinbase.com/learn/crypto-
27  basics/what-is-a-stablecoin (last accessed March 22, 2024);
    https://www.coinbase.com/learn/crypto-basics/what-is-a-stablecoin (last accessed March 22,
28  2024).
    [5] https://web.archive.org/web/20220512032041/www.coinbase.com/price/terrausd

1   45.    Plaintiff and Class Members had no reason to disbelieve Coinbase's representation that

2   UST was free of the volatility of non-pegged cryptocurrencies.  The only thing on Coinbase's

3   website that even acknowledged the existence of LUNA in relation to UST was a single

4   sentence on the UST webpage providing that, "in order to mint 1 TerraUSD, US$1.00 worth of

5   TerraUSD's reserve asset (LUNA) must be burned."  No reasonable consumer of

6   cryptocurrency in 2021-2022 would have understood from this one sentence that UST's peg

7   was reliant on an algorithm tethered to a volatile cryptocurrency. There was no accompanying

8   explanation of minting or burning, what this relationship meant in practical terms for the

9   reliability of UST's peg, or that LUNA was a volatile non-pegged cryptocurrency that existed

10  within the same ecosystem as UST.  This is the epitome of a half-truth. Coinbase knew LUNA

11  was highly volatile and had already caused UST and other Terra stablecoins to lose their

12  purported pegged value. It could have and should have disclosed this material information.

13  46.    Moreover, Coinbase knew UST's peg was fundamentally reliant on the market's faith in

14  its LUNA-based algorithm. Once confidence in the algorithm wavered, the algorithm was

15  helpless in stopping the ensuing death spiral. This outcome was known or reasonably

16  foreseeable to Coinbase yet it did not disclose it in any way.

17  **E. Coinbase Concealed Material Information and Insights Derived Through Its**

18  **Internal Assessments of UST and Other Terra Ecosystem Products**

19  47.    Coinbase Inc. was founded in 2012 by Fred Ehrsam and Brian Armstrong. Armstrong

20  serves today as the company's Chief Executive Officer.

21  48.    In a 2022 interview, CEO Armstrong described Coinbase as a centralized

22  "cryptocurrency exchange, brokerage and custodian."[6] Armstrong highlighted Coinbase's

23  leading position in the cryptocurrency world, stating Coinbase is "the primary financial account

24  for people in the crypto economy."[7] Armstrong underscored Coinbase's reliable nature as an

25

26

27  [6] Brian Armstrong: Coinbase, Cryptocurrency, and Government Regulation, LEX FRIDMAN
    PODCAST, (July 29, 2022), https://www.youtube.com/watch?v=VBPTFlpv31k.
28  [7] Id.

exchange, noting that "[Coinbase is the] most trusted place for people and businesses to buy, sell, and manage crypto." Coinbase also publicly acknowledged that an asset "being listed on Coinbase [is] seen as like an endorsement" by its customers and the public.[8]

49.     Around the same time, Coinbase represented on its website and blog that "every digital asset on Coinbase goes through an extensive review process ensuring it meets our security and compliance requirements." It also represented that "all assets, regardless of whether Coinbase Ventures holds an investor or Coinbase holds for operational purposes, are subject to the same strict review guidelines and review process." Coinbase described this process as a "rigorous vetting/review process."

50.     Coinbase has, at all relevant times, made representations on its website regarding what that review process entails. During the relevant time period when Plaintiff researched UST on Coinbase's website and decided to purchase it, Coinbase explained that its review framework included factors such as the legitimacy of a project's white paper, the history of the asset's project team, details of how the token works, and whether the asset could be used to defraud or harm consumers. According to Coinbase, it also analyses quantitative and qualitative criteria like historical token prices, investment and financing history, a technical roadmap, and information about how tokens are earned, burned, and distributed. Coinbase also represented that its review process weeds out approximately 90% of the assets that apply to be listed on Coinbase and has identified almost 100 projects with tokens Coinbase scored as high risk and chose not to list.

51.     During the relevant time period, Coinbase's internal assessments were performed by a team of researchers with special knowledge of the cryptocurrency industry. These researchers had unique training and experience in researching and assessing cryptocurrencies, with an eye toward identifying, among other things, risk to consumers. Sources of information used in these assessments included both publicly available information as well as non-public information, including information provided exclusively to Coinbase by the asset project team.

---

[8] Brian Armstrong: Coinbase, Cryptocurrency, and Government Regulation, LEX FRIDMAN PODCAST, (July 29, 2022), https://www.youtube.com/watch?v=VBPTFlpv31k.

FOURTH AMENDED CLASS ACTION COMPLAINT: CASE NO. 3:22-CV-03561-MMC

52.     The assessments resulted in a "scorecard," which assigned scores to a set of quantitative and qualitative criteria. Coinbase does not publicly disclose asset review scorecards or its specific criteria but has disclosed information about its review and listing decision-making process. For example, in or around April 2022, Coinbase stated that pre-requisites to an asset being listed on its exchange include a determination that there is market-making support and sufficient technical infrastructure in place.

53.     In December 2021, Coinbase acknowledged publicly on its website that it "has an independent role and obligation" to analyze assets it is considering for listing to the best of its ability in light of all the information available to it.

54.     Based on Plaintiff's research and review of Coinbase's website and based on the fact that UST was listed on Coinbase, he reasonably understood that Coinbase had evaluated UST's inner workings, historical pricing, and Terraform Lab's team's affiliations and historical cryptocurrency ventures, and determined UST did not stand to defraud or harm him or other investors and that UST was in fact pegged to the dollar and free from the volatility of other non-pegged cryptocurrencies. Unfortunately, Plaintiff was misled in this belief.

55.     In 2021, Coinbase performed an assessment of LUNA. Because LUNA was built on the unique Terra blockchain, which Coinbase's exchange did not support, it was not ultimately listed on Coinbase. Nonetheless, by virtue of assessing LUNA, Coinbase was made aware of the inner operations of the Terra ecosystem, including LUNA, UST, the Anchor Protocol, and other Terra products.

56.     In or around mid 2021, prior to listing UST on its exchange, Coinbase performed an internal assessment of UST through which it evaluated, among other things, UST's risk to consumers, compliance with Coinbase's internal guidelines and policies, background of its project management team, including Do Kwon, the mechanism used to maintain its value, and its dependence on the price of LUNA. By that point, Coinbase knew Terra stablecoins had difficulty maintaining their peg. Prior to this assessment, in May 2021, LUNA had crashed, causing UST to fall below its purported $1 peg for approximately four days. Also prior to the 2021 UST assessment, two other algorithmic Terra stablecoins, TerraKRW (KRT) and THT,

1  purportedly pegged 1:1 to the Korean Won and Thai Bhat, respectively, had both fallen
2  noticeably below their nominal pegs the prior year. Like UST, TerraKRW and THT were not
3  backed by any reserve of assets but were propped up algorithmically by LUNA. Thus, at the
4  time of the 2021 UST assessment, Coinbase knew or reasonably should have known that LUNA
5  was highly volatile and prone to crashing. Coinbase further knew that UST was inextricably
6  linked with LUNA's volatile price fluctuations and that at least three Terra stablecoins paired to
7  LUNA, including UST, had already failed due to their dependence thereon.

8  57.     Also prior to Coinbase's 2021 UST assessment, in or around May 2021, the SEC began
9  scrutinizing another Terraform Labs' product known as Mirror Protocol. The SEC's
10  investigation focused on whether the native Mirror tokens, mAssets and MIR, which were
11  marketed as having values pegged to real stocks like Apple and Tesla, constituted unregistered
12  securities and whether Terraform Labs and Do Kwon had marketed them to U.S. investors. At
13  the time, the SEC's investigation was non-public. Coinbase, however, knew or reasonably
14  should have known of the investigation, as it would have been part of Coinbase's assessment of
15  UST, according to Coinbase's description of review criteria. An investigation by the SEC into
16  Kwon and Terraform Labs for potential securities violations was or should have been a
17  significant red flag to Coinbase in evaluating UST, as it indicates risk affiliated with UST's
18  project team. It also provided a basis from which Coinbase knew or reasonably should have
19  known that UST was an unregistered security.

20  58.     In conducting its review of UST, Coinbase evaluated the same criteria it does for non-
21  pegged cryptocurrencies. In other words, there was nothing unique about Coinbase's assessment
22  of UST—a purported stablecoin—compared to a traditionally volatile cryptocurrency.

23  59.     Coinbase performed another assessment of UST in 2022, prior to the May 2022 crash.
24  At the time of this second assessment, Coinbase knew that the price of LUNA had crashed in
25  May 2021 causing UST to fall below its purported $1 peg for approximately four days.
26  Coinbase knew or should have known UST faced an especially acute risk of suffering more
27  frequent and extreme depegging events due to its algorithmically supported peg, dependence on
28  the volatile LUNA, and historical information.

60.     In 2022, Coinbase also performed an assessment of Wrapped Luna (WLUNA). A "wrapped token" is a token pegged to a particular cryptocurrency but operated on different blockchain network. LUNA was built on a unique network technology not supported by Coinbase and therefore LUNA was not listed on Coinbase. WLUNA, which operated on the widely used blockchain network Ethereum, was created to serve as an equivalent to LUNA. Because one WLUNA could be exchanged for one LUNA (and vice-versa), WLUNA tracked LUNA's price and allowed LUNA investors to trade on the Ethereum network. Based on this assessment, Coinbase knew or should have known that WLUNA, and therefore LUNA, was a volatile non-pegged cryptocurrency accompanied by the other red flags and risk factors discussed above.

61.     The above information Coinbase compiled and conclusions it reached in its assessments of UST, LUNA, and WLUNA were material to Plaintiff and Class Members' decisions to invest in the purported stablecoin UST.  But-for Coinbase's omission of the above information and conclusions, including but not limited to WLUNA/LUNA being high risk and UST's dependence on it and that the key individuals responsible for the Terraform ecosystem—Do Kwon in particular—had a history of failed crypto assets and was currently under investigation by the SEC, Plaintiff and Class Members would have chosen not to invest in UST.

62.     Coinbase knew that disclosing this information would deter investors from buying UST on its exchange, which would, in turn, take away from its bottom line. Coinbase therefore omitted this information with the intent to deceive Plaintiff and Class Members into believing UST had characteristics and qualities it did not in order to induce them to purchase UST on its exchange.

63.     In 2021 and again in 2022, Coinbase Ventures invested millions of dollars in Terraform Labs. This "interlinkage" between stablecoin issuer and the cryptocurrency exchange where UST was traded also motivated Coinbase to promote and sell UST without disclosing its volatile nature.

64.     Coinbase had exclusive knowledge of this information, and it was not reasonably discoverable by Plaintiff and Class Members. That is, the assessments relied on non-public

FOURTH AMENDED CLASS ACTION COMPLAINT: CASE NO. 3:22-CV-03561-MMC
16

1    information and the resulting scorecards (and conclusions therein) remain confidential. While
2    Coinbase's assessments did rely in part on information that was technically available to the
3    public, average consumers like Plaintiff and Class Members did not have the requisite
4    knowledge, training, or experience to know what to look for and where to look for it, how to
5    decipher it even if they were able to locate it, or how to read the varied pieces of information
6    holistically to assess risk in the way that Coinbase does. In light of these circumstances,
7    Coinbase had a duty to disclose this information. Coinbase itself acknowledged the importance
8    of its assessments, stating publicly in December 2021 that it "has an independent role and
9    obligation" to analyze assets it is considering for listing to the best of its ability in light of all
10   the information available to it.

11   65.    Coinbase's omission of this information alone was reasonably likely to mislead the
12   average consumer. When combined with Coinbase's affirmative partial representations about
13   UST (i.e., classifying it as a "stablecoin" but omitting its algorithmic nature) and its
14   demonstrably false statement that UST was "free from the volatility of non-pegged
15   cryptocurrencies," Coinbase's omissions were virtually guaranteed to mislead consumers—and
16   in fact did mislead Plaintiff and Class Members.

17       **F. Coinbase's Representations and Omissions Were Especially Misleading in light of**
18          **the Relative Nascency of Stablecoins**

19   66.    Coinbase's representations and omissions were made at a point in time when stablecoins
20   were still relatively new in mainstream crypto, and the newest form of stablecoin—the
21   algorithmic stablecoin—was little-known and much less understood. Few stablecoins actually
22   existed even up until 2022, and the differences in stabilizing mechanisms were not reasonably
23   understood by the average reasonable consumer, including Plaintiff. Indeed, prior to UST being
24   listed on Coinbase, only two other stablecoins were listed on the Coinbase platform, neither of
25   which were algorithmic stablecoins. UST was the first algorithmic stablecoin ever listed on
26   Coinbase.

27
28

67.     Even those in the industry struggled to understand, let alone accurately explain in lay-person terms, how non-collateralized or algorithmic stablecoins worked (or were supposed to work).

68.     Reference sources, like Investopedia, did not identify UST as an algorithmic stablecoin or non-collateralized stablecoin until May 11, 2022—*after* it had already crashed. Following the catastrophic May 2022 crash, the internet was—unsurprisingly—brimming with articles providing detailed explanations (albeit still highly technical and indecipherable to the average consumer) about the interplay between UST and LUNA and how Terra's algorithm failed.

### G. Coinbase Sold UST on Its Trading Platform

69.     Coinbase is an online marketplace that operates two digital asset exchanges, "Coinbase" and "Coinbase Pro." It offers its U.S. customers the power to trade over 150 cryptocurrencies and was at all relevant times the largest cryptocurrency exchange in the U.S. by volume. Coinbase describes itself as "building the cryptoeconomy–a more fair, accessible, efficient, and transparent financial system enabled by crypto." For Plaintiff and Class members, that promise has proved illusory.

70.     While Coinbase is licensed as a "Virtual Currency & Money Transmitter" under the New York Department of Financial Services' Virtual Currency Law, it is not registered with FINRA or the SEC as a securities exchange or broker-dealer. Nor is it licensed to sell securities (whether registered or not).

71.     Customers place orders to buy and sell cryptocurrencies through Coinbase's platforms, and Coinbase acts as a custodian of users' digital assets, holding asset encryption keys on behalf of its users. As an alternative, the company offers "Coinbase Wallet" which purportedly gives customers control and custody over their cryptocurrencies and corresponding encryption keys.

72.     Coinbase operated as a centralized exchange of cryptocurrency assets. A customer on a centralized exchange creates an account on that exchange, and the exchange will then provide that customer with a deposit address that the exchange controls. When the customer deposits digital assets into the deposit address, the exchange will credit her trading account accordingly.

1  The exchange will typically then transfer the digital assets into one of its other addresses for
2  storage.

3  73.    The trades conducted on Coinbase do <u>not</u> actually involve the transfer of any assets
4  directly <u>between users</u>. Instead, Coinbase transfers the assets. For example, if Investor A wishes
5  to trade one Bitcoin for 10 Ethereum on Coinbase, Coinbase will update its internal records to
6  debit Investor A's account one Bitcoin and credit it 10 Ethereum; no digital assets are actually
7  moved on the blockchain.

8  74.    Nor does Investor A's Bitcoin get transferred to anyone <u>other than Coinbase</u>. While
9  Coinbase may use other traders' orders to determine the relative prices of digital assets and the
10 rate at which they are exchanged, the <u>only actual transactions that occur are between Investor A</u>
11 <u>and Coinbase</u>.

12 75.    A Coinbase user who wishes to make a transaction never interacts with another user,
13 sends no asset to another user, receives no asset from another user, and has no blockchain-
14 recorded interaction with another user. Customers on Coinbase transact solely with Coinbase
15 itself. Coinbase was, therefore, the seller of any UST purchased on the Coinbase exchange and
16 was in a privity relationship with the purchaser—in this case, Plaintiff and the Class.

17 76.    Coinbase's operations also demonstrate that Coinbase holds an ownership stake in
18 cryptocurrencies exchanged on its platform and therefore was the actual seller of the UST
19 purchased by Plaintiff and the Class. First, Coinbase possesses the encryption keys to assets
20 customers purchase on its platform, thereby giving it possessory power of those assets. Second,
21 Coinbase controls the market for the assets exchanged on its platform based on different
22 liquidity predictions, terminating trading when it sees potential liquidity shortfalls. It exercised
23 that control with respect to UST when, on May 27, 2022, it suspended all trading for UST. As
24 such, Coinbase owned the UST on its platform and was the actual seller when Plaintiff and the
25 Class made their purchases of UST.

26     **H. Coinbase Actively and Directly Promoted and Solicited Sales of UST**

27 77.    Coinbase offered to sell UST by soliciting sales of UST through numerous mass media
28 platforms. In August 2021, Coinbase posted on its X (formerly known as Twitter) account,

1  announcing that UST could be purchased on its exchange. Coinbase also advertised the sale of
2  UST on the Coinbase platform by posting on the website Medium in August 2021. Coinbase
3  also promoted and solicited sales of UST through posts it made to the popular website Reddit.
4  These posts and advertisements, which were created by Coinbase, directly marketed UST to
5  investors, feeding them to coinbase.com, where the misstatements discussed *supra* led
6  investors, including Plaintiff, to buy UST. Because Coinbase publicly published promotions on
7  X (Twitter), Medium, and Reddit announcing the sale of UST on its exchange, Coinbase
8  solicited UST purchases. By doing so, Coinbase materially assisted in the sale of UST.

9  78.    These UST transactions benefited Coinbase financially in the form of transaction fees.
10  Coinbase was also one of the largest financial backers of Terraform Labs, the "minters" of UST,
11  and partnered with it to create markets for UST, which would in turn benefit Coinbase.

12  79.    Through its partnership with Terraform Labs, Coinbase allowed for more UST tokens to
13  be issued to more investors. In the process, Coinbase increased their own profits because it
14  receives a commission for every trade executed.  As such, Coinbase solicited offers to buy UST
15  motivated, at least in part, by its own financial interests.

16  80.    Because UST was available on cryptocurrency exchanges, Defendant's numerous posts
17  and advertisements regarding UST are solicitations to the public at large where the persons or
18  investors being solicited are selected at random, rather than specifically or individually targeted.

19      I. UST and LUNA Crash

20  81.    UST promoters, such as Coinbase, assured investors that the interplay between
21  Terraform Labs' systems and UST offered a stable alternative to traditional cryptocurrency
22  investments. As a result, the popularity of UST grew, and it became "the world's third-biggest
23  stablecoin before it lost its peg to the dollar."[9]

24

25

26

_____

27  [9] https://markets.businessinsider.com/news/currencies/terrausd-luna-crash-ethereum-vitalik-
28  buterin-do-kwon-stablecoin-crypto-2022-5 (last accessed May 20, 2022).

82.     The price of UST—which was intended to maintain a $1 peg—showed signs of instability on May 7, 2022 and dropped to 35 cents by May 9, 2022.[10] LUNA, the companion token that was supposed to stabilize UST's price, "fell from $80 to a few cents by May 12."[11] Over $18 billion was wiped out in the collapse.

83.     On May 20, 2022, several sources reported that "South Korean prosecutors are actively investigating whether they could make additional Ponzi scheme charges against Terraform Labs CEO Do Kwon, adding to the complaints already filed against the entrepreneur over Terra's dramatic implosion."

84.     Plaintiff and Class members incurred damages as a result of Coinbase's actions, including its misrepresentations about the nature and stability of UST and its material omissions regarding UST's stability and lack of collateralization and its status as an unregistered security.

### J. Coinbase's Duty to Disclose the True Nature and Risks of UST

85.     Exclusive or Superior Knowledge: As described above, Coinbase is the third largest trading platform for UST and one of the largest cryptocurrency trading platforms in the United States. As an experienced and sophisticated trading platform, Coinbase conducts due diligence into the stability, merit, and technical underpinnings of each cryptocurrency made available on its platform. Additionally, as a significant institutional investor in Terraform Labs, the creator of UST, Coinbase had superior access to information about UST and was at all relevant times aware of the true nature of UST, including that UST was based on an uncertain and untested algorithm.

86.     Partial Representations: As described above, Coinbase prominently represented on its trading platform that UST was a "stablecoin" that "attempts to maintain a value of US $1.00" and defined stablecoin on its "What is a Stablecoin" webpage, including representing that stablecoins are "free from the volatility of non-pegged cryptocurrencies." Yet Coinbase omitted that UST is, in fact, inextricably linked to a non-pegged cryptocurrency, and a particularly

---

[10] https://www.coindesk.com/learn/the-fall-of-terra-a-timeline-of-the-meteoric-rise-and-crash-of-ust-and-luna/ (last accessed May 23, 2022).
[11] *Id.*

FOURTH AMENDED CLASS ACTION COMPLAINT: CASE NO. 3:22-CV-03561-MMC

1    volatile one at that. By disclosing some material attributes regarding the functionality and
2    technical underpinnings of UST, Coinbase is obligated to disclose material qualifications that
3    bear negatively on UST.

4    87.    Coinbase could have and should have prominently disclosed the omitted information on
5    its trading platform and website.  Had Coinbase disclosed the omitted information in this
6    manner, Plaintiff and Class members would have been aware of it.

7                      **V.    PLAINTIFF'S FACTUAL ALLEGATIONS**

8    88.    Plaintiff Pearl has been a customer of Coinbase since 2019.

9    89.    In May 2022, Plaintiff Pearl made purchases of UST on the Coinbase exchange.

10   90.    Shortly before purchasing UST on the Coinbase exchange, Plaintiff viewed and relied on
11   representations made by Coinbase, on its website and trading platform, regarding UST.
12   Specifically, Plaintiff saw on the Coinbase website and trading page that UST was an
13   unqualified "stablecoin." Plaintiff also viewed Coinbase's "What is a stablecoin?" webpage
14   described above, including the description of "stablecoin" as a "digital currency that is pegged
15   to a 'stable' reserve asset like the U.S. dollar or gold," that "[s]tablecoins are free from the
16   volatility of non-pegged cryptocurrencies," and that "[a]n asset that's pegged to a more stable
17   currency can give buyers and sellers certainty that the value of their tokens won't rise or crash
18   unpredictably in the near future."

19   91.    Based on Coinbase's leading position in the crypto exchange marketplace and its claim
20   that it only lists assets after having performed a rigorous review geared toward, among other
21   things, vetting for risk to consumers, Plaintiff reasonably viewed the fact that UST was listed on
22   Coinbase as an endorsement by Coinbase that UST and its affiliated Terra ecosystem were free
23   of red flags that might implicate consumer protection concerns, including the reliability of
24   UST's peg.

25   92.    Based on Coinbase's representations and omissions, Plaintiff understood that UST was a
26   standard stablecoin, price-stable, and not dependent on or impacted by the volatility of any non-
27   pegged cryptocurrency.

28

93.   At no point prior to UST's crash in May 2022 did Plaintiff see or read any part of Terraform Lab's whitepaper about UST.

94.   At no point prior to UST's crash had Plaintiff ever heard of an "algorithmic" stablecoin.

95.   At the time of purchase, Plaintiff was unaware that uncollateralized "stablecoins" were made available by Coinbase on its trading platform, that UST was not collateralized by any tangible reserve asset, and that UST was designed to maintain a peg through an algorithm. Plaintiff was also unaware that UST was impacted by the volatility of LUNA, a non-pegged cryptocurrency.

96.   But for Coinbase's misrepresentations and omissions above, Plaintiff would not have purchased UST.

97.   At the time of the collapse, Plaintiff's total UST holdings were approximately $13,064.

98.   When UST collapsed, the value of Plaintiff's investment fell in value by over 90 percent. Plaintiff experienced significant emotional stress during this time period. Plaintiff had to idly watch as tens of thousands of dollars of his savings vanished minute by minute while his ability to trade was suspended. This was devastating to Plaintiff. Plaintiff suffered emotional harm resulting from the sudden, unexpected, and catastrophic losses UST incurred, including stress, anxiety, and outrage.

99.   Plaintiff also lost valuable time in connection with the UST crash. Plaintiff spent hours of his time trying to sell his remaining UST to stop the depletion of his savings, researching ways to unwind his purchases, and seeking help from his bank and from lawyers trying to find a way to remedy the situation.

## VI.   CLASS ACTION ALLEGATIONS

100.   Plaintiff brings this action on behalf of himself and the following Class pursuant to Federal Rule of Civil Procedure 23(a), (b)(2) and (b)(3). Specifically, the Class and California Subclass are defined as:

> **National Class**: During the fullest period allowed by law, all persons in the United States who purchased or acquired UST in the United States or its territories and whose transactions of UST were conducted through Coinbase.

**California Subclass**: During the fullest period allowed by law, all persons in the State of California who purchased or acquired UST in California and whose transactions of UST were conducted through Coinbase.

101.   Excluded from the Class is (a) any person who signed a release of any Defendant in exchange for consideration, (b) any officers, directors or employees, or immediate family members of the officers, directors or employees, of any Defendant or any entity in which a Defendant has a controlling interest, (c) any legal counsel or employee of legal counsel for any Defendant, and (d) the presiding Judge in this lawsuit, as well as the Judge's staff and their immediate family members:

102.   Plaintiff reserves the right to amend the definition of the Class if discovery or further investigation reveals that the Class and/or California Subclass should be expanded or otherwise modified.

103.   **Numerosity – Federal Rule of Civil Procedure 23(a)(1).** Class Members are so numerous and geographically dispersed that joinder of all Class Members is impracticable. While the exact number of Class Members remains unknown at this time, upon information and belief, there are thousands, if not hundreds of thousands, of proposed Class Members. Moreover, the number of members of the Class may be ascertained from Defendant's books and records. Class Members may be notified of the pendency of this action by mail or electronic mail, which can be supplemented if deemed necessary or appropriate by the Court with published notice.

104.   **Predominance of Common Questions of Law and Fact – Federal Rule of Civil Procedure 23(a)(2) and 23(b)(3).** Common questions of law and fact exist as to all Class Members and predominate over any questions affecting only individual Class Members. These common legal and factual questions include, but are limited to, the following:

    a.   Whether Coinbase negligently misrepresented UST to Plaintiff and the proposed Class;

    b.   Whether Coinbase engaged in unlawful, unfair, or fraudulent business practices in connection with UST trading on the Coinbase exchange;

    c.   Whether Coinbase's actions and omissions violate California law;

1

d.  Whether Coinbase's conduct violates public policy;

2

e.  Whether UST constitutes a security under California securities law;

3

f.  Whether Coinbase sold or offered to sell UST as a primary seller, or, in the

4

alternative, as a secondary seller/non-issuer;

5

g.  Whether Coinbase materially assisted in selling or offering to sell UST as a

6

secondary seller/non-issuer;

7

h.  Whether Coinbase made misstatements and omissions in communications in

8

connection with the offer or sale of UST, or, in the alternative, as a secondary

9

seller/non-issuer;

10

i.  Whether Coinbase materially aided in the making of misstatements and omissions in

11

communications in connection with the offer or sale of UST as a secondary

12

seller/non-issuer;

13

j.  Whether Plaintiff and members of the proposed Class are entitled to monetary

14

damages and, if so, the nature of such relief; and

15

k.  Whether Plaintiff and members of the proposed Class are entitled to equitable,

16

declaratory or injunctive relief and, if so, the nature of such relief.

17

105.    Pursuant to Rule 23(b)(2), Defendant has acted or refused to act on grounds generally

18

applicable to the proposed Class, thereby making final injunctive or corresponding declaratory

19

relief appropriate with respect to the proposed Class as a whole. In particular, Defendant has

20

marketed, advertised, distributed, and facilitated the sale of UST on the Coinbase platform and

21

such marketing and advertising was materially misleading.

22

106.    **Typicality – Federal Rule of Civil Procedure 23(a)(3).** Plaintiff's claims are typical of

23

those of the absent Class Members in that Plaintiff and the Class Members each purchased UST

24

on the Coinbase platform and each sustained damages arising from Defendant's wrongful

25

conduct, as alleged more fully herein. Plaintiff shares the aforementioned facts and legal claims

26

or questions with proposed members of the Class, and Plaintiff and all members of the proposed

27

Class have been similarly affected by Defendant's common course of conduct alleged herein.

28

Plaintiff and all members of the proposed Class sustained monetary and economic injuries

1  including, but not limited to, ascertainable loss arising out of Defendant's conduct and the
2  subsequent fall in value of UST.

3  107.   **Adequacy – Federal Rule of Civil Procedure 23(a)(4).** Plaintiff will fairly and
4  adequately represent and protect the interests of the members of the proposed Class. Plaintiff
5  has retained counsel with substantial experience in handling complex class action litigation,
6  including complex questions that arise in this type of consumer protection litigation. Further,
7  Plaintiff and his counsel are committed to the vigorous prosecution of this action. Plaintiff does
8  not have any conflicts of interest or interests adverse to those of proposed Class.

9  108.   **Insufficiency of Separate Actions – Federal Rule of Civil Procedure 23(b)(1).**
10  Absent a class action, Plaintiff and members of the Class will continue to suffer the harm
11  described herein, for which they would have no remedy. Even if separate actions could be
12  brought by individual consumers, the resulting multiplicity of lawsuits would cause undue
13  burden and expense for both the Court and the litigants, as well as create a risk of inconsistent
14  rulings and adjudications that might be dispositive of the interests of similarly situated
15  consumers, substantially impeding their ability to protect their interests, while also establishing
16  incompatible standards of conduct for Defendant. Accordingly, the proposed Class satisfies the
17  requirements of Fed. R. Civ. P. 23(b)(1).

18  109.   **Declaratory and Injunctive Relief – Federal Rule of Civil Procedure 23(b)(2).**
19  Defendant has refused to act on grounds generally applicable to Plaintiff and all proposed Class
20  Members, thereby making appropriate final injunctive relief and declaratory relief, as described
21  below, with respect to the members of the Class as a whole.

22  110.   **Superiority – Federal Rule of Civil Procedure 23(b)(3).** A class action is superior to
23  any other available methods for the fair and efficient adjudication of the present controversy for
24  at least the following reasons:

25  111.   The damages suffered by each individual member of the proposed Class do not justify
26  the burden and expense of individual prosecution of the complex and extensive litigation
27  necessitated by Defendants' conduct;

28

1  112.  Even if individual members of the Class had the resources to pursue individual

2  litigation, it would be unduly burdensome to the courts in which individual litigation would

3  proceed;

4  113.  The claims presented in this case predominate over any questions of law or fact affecting

5  individual members of the Class;

6  114.  Individual joinder of all members of the Class is impracticable;

7  115.  Absent a Class, Plaintiff and members of the proposed Class will continue to suffer harm

8  as a result of Defendants' unlawful conduct; and

9  116.  This action presents no difficulty that would impede its management by the Court as a

10  class action, which is the best available means by which Plaintiff and members of the proposed

11  Class can seek redress for the harm caused by the Defendant.

12  117.  In the alternative, the Class may be certified for the following reasons:

13  118.  The prosecution of separate actions by individual members of the Class would create a

14  risk of inconsistent or varying adjudication with respect to individual members of the Class,

15  which would establish incompatible standards of conduct for Defendants';

16  119.  Adjudications of claims of the individual members of the Class against the Defendant

17  would, as a practical matter, be dispositive of the interests of other members of the proposed

18  Class who are not parties to the adjudication and may substantially impair or impede the ability

19  of other proposed Class Members to protect their interests; and

20  120.  Defendant has acted or refused to act on grounds generally applicable to the members of

21  the proposed Class, thereby making appropriate final and injunctive relief with respect to the

22  proposed Class as a whole.

23  ### VII.  INADEQUACY OF LEGAL REMEDIES

24  121.  In the alternative to those claims seeking remedies at law, Plaintiff and Class members

25  allege that no plain, adequate, and complete remedy exists at law to address Defendants'

26  unlawful and unfair business practices. The legal remedies available to Plaintiff are inadequate

27  because they are not "equally prompt and certain and in other ways efficient" as equitable relief.

28  *American Life Ins. Co. v. Stewart*, 300 U.S. 203, 214 (1937); *see also United States v. Bluitt*,

1  815 F. Supp. 1314, 1317 (N.D. Cal. Oct. 6, 1992) ("The mere existence' of a possible legal

2  remedy is not sufficient to warrant denial of equitable relief."); *Quist v. Empire Water Co.*, 2014

3  Cal. 646, 643 (1928) ("The mere fact that there may be a remedy at law does not oust the

4  jurisdiction of a court of equity. To have this effect, the remedy must also be speedy, adequate,

5  and efficacious to the end in view … It must reach the whole mischief and secure the whole

6  right of the party in a perfect manner at the present time and not in the future.").

7  122.    Additionally, unlike damages, the Court's discretion in fashioning equitable relief is

8  very broad and can be awarded when the entitlement to damages may prove difficult. *Cortez v.*

9  *Purolator Air Filtration Products Co.*, 23 Cal.4th 163, 177-180 (2000) (restitution under the

10  UCL can be awarded "even absent individualized proof that the claimant lacked knowledge of

11  the overcharge when the transaction occurred.").

12  123.    Thus, restitution would allow recovery even when normal consideration associated with

13  damages would not. *See, e.g., Fladeboe v. Am. Isuzu Motors Inc.*, 150 Cal. App. 4th 42, 68

14  (2007) (noting that restitution is available even when damages are unavailable). Furthermore,

15  the standard and necessary elements for a violation of the UCL "unfair" prong and for unjust

16  enrichment are different from the standard that governs legal claims, such that Defendant may

17  be found liable for equitable claims even if Defendant is not liable for legal claims.

18 / 19

## VIII.   TOLLING OF THE STATUTES OF LIMITATIONS AND DELAYED
## DISCOVERY

20  124.    All applicable statutes of limitations have been tolled by the delayed discovery doctrine.

21  125.    Plaintiff and the Class could not have reasonably discovered that Defendant was

22  engaged in the practice of selling an unregistered security, and that UST was in fact an

23  unregistered security, until December 2023 when the first federal district court ruled that UST

24  was a security.[12]  Defendant and Terraform Labs have at all times denied that UST was a

25  security subject to the registration requirements discussed herein.

26

27  _____

28  [12] *See SEC v. Terraform Labs PTE. LTD., et al.*, No. 23-cv-1346 (JSR), 2023 WL 8944860, at
*13-14 (S.D.N.Y., Dec. 28, 2023).

1    126.    Additionally, Plaintiff and the Class could not have reasonably discovered Defendant's
2    deceptive practices complained of herein until the market price of UST cratered and this class
3    action litigation commenced.

4    127.    Plaintiff did not learn that Defendant was engaged in the practice of selling an
5    unregistered security, and that UST was in fact an unregistered security, until shortly before the
6    filing of this Amended Complaint.

7    128.    Furthermore, all applicable statutes of limitations were tolled during the pendency of the
8    arbitration preceding the filing of this Amended Complaint.

9    129.    As a result, any and all applicable statutes of limitations otherwise applicable to the
10    allegations herein have been tolled.

11                              IX.    **CAUSES OF ACTION**

12                                    **COUNT I**

13                            **Negligent Misrepresentation**

14                        **(on Behalf of the National Class)**

15    130.    Plaintiff re-alleges and incorporates by reference the allegations contained in the
16    previous paragraphs as though set forth fully herein.

17    131.    Coinbase represented to Plaintiff and the Class, through its statements and asset
18    classification, that UST was a stablecoin, which Coinbase defined as "a digital currency that is
19    pegged to a 'stable' reserve asset like the U.S. dollar or gold," and that, in the case of UST, it
20    was pegged 1:1 to the US dollar.

21    132.    Coinbase also represented that, as a stablecoin, UST "was free from the volatility of
22    non-pegged cryptocurrencies." Plaintiff read and relied on this statement and understood it to
23    mean that UST was not tied to or otherwise affected by the changing price of any non-pegged
24    cryptocurrency. This is an absolute characteristic. As an objective matter of technical operation,
25    UST either is or is not dependent on or otherwise impacted by a non-pegged cryptocurrency.
26    While this statement might be true for stablecoins that are collateralized by a fiat currency,
27    commodity, or other non-crypto asset with cash equivalent, it is demonstrably false as to UST.
28    As explained more fully above, UST's pegged value was fundamentally intertwined with or

1  paired to the price of LUNA, which is a volatile non-pegged cryptocurrency. Coinbase knew
2  this based on its internal assessments of UST, LUNA, and WLUNA.

3  133.    Coinbase also represented to Plaintiff and Class Members that "every digital asset on
4  Coinbase goes through an extensive review process ensuring it meets our security and
5  compliance requirements" and acknowledged its customers see its listing of an asset as an
6  endorsement.

7  134.    As more fully set forth *supra*, Coinbase represented that its rigorous review includes
8  performing due diligence on the key members of the team behind the asset to determine whether
9  they have criminal records or have perpetrated other frauds as well as looking for other "red
10 flags." Also as explained above, Coinbase conducted internal assessments of UST, LUNA, and
11 WLUNA, through which Coinbase was made aware of material information about these tokens,
12 including but not limited to the interconnected nature of UST's price with LUNA's fluctuating
13 price. Coinbase had exclusive or superior knowledge of prior depegging events involving UST
14 as well as other Terra stablecoins tethered to LUNA. It also knew about other material risk
15 factors such as the SEC investigation into Do Kwon and Terraform Lab's Mirror Protocol for
16 potential securities violations.  Coinbase concealed this material information from Plaintiff and
17 Class Members. As described above, some of the internal assessment information was
18 exclusively known to Coinbase. For example, the SEC's investigation into Do Kwon and
19 Terraform Labs before it became public and information in the asset application that was only
20 provided to Coinbase. While some of the sources of information used in Coinbase's internal
21 assessments may technically have been publicly available, a reasonable consumer would not
22 know to look for such sources or how to obtain the correct information, let alone be able to
23 comprehend them. Coinbase performed its internal assessment using specially trained asset
24 researchers with unique knowledge and expertise in assessing cryptocurrencies. Even if Plaintiff
25 or Class Members knew where to find all the same information Coinbase was privy to, they
26 would not have been able to wade through the technical explanations or understand their
27 implication with respect to the risk posed to them. As alleged above, Plaintiff did not read the
28 UST whitepaper and did not know that UST was tied to LUNA and that LUNA had a propensity

1  to cause its pegged stablecoins to depeg. But-for Coinbase's concealment of this fact, Plaintiff
2  would not have purchased UST.

3  135.    Coinbase also knew but failed to disclose that the entire Terraform ecosystem was risky,
4  which is materially relevant to the reliability of UST. Specifically, Coinbase knew but failed to
5  disclose that UST's sister token, LUNA, was responsible for maintaining UST's peg and that
6  LUNA was especially volatile. Coinbase also knew yet failed to disclose that the key
7  individuals responsible for the Terraform ecosystem—Do Kwon in particular—had a history of
8  failed crypto assets, including a prior failed algorithmic stablecoin. Coinbase knew these facts
9  because it performed audits of information submitted to it by Terraform Labs. These audits
10 resulted in "scorecards," filled out for each asset but kept confidential. By listing UST on its
11 exchange, Coinbase implicitly represented that UST had passed Coinbase's rigorous review
12 process through which Coinbase vets its safety and security, its founders, and other possible
13 "red flags." Despite its knowledge of red flags and risk, Coinbase listed both UST and WLUNA
14 but did not disclose any of the knowledge and red flags it exclusively maintained. Had Plaintiff
15 and Class Members known of the high risk assessments, they would not have purchased UST.

16 136.    Defendant owed a duty to Plaintiff and Class members to speak with care and explain
17 fully and truthfully all material facts regarding the UST. This duty arose from several bases,
18 including Section 5 of the FTC Act, which prohibits "deceptive acts or practices in or affecting
19 commerce." This provision encompasses material representations, omissions, or practices that
20 are likely to mislead a reasonable consumer.

21 137.    Defendant's duty to speak truthfully and with care also arose under Section 200.18(d) of
22 the State of New York Department of Financial Services' Virtual Currency law, which prohibits
23 "false, misleading, or deceptive representations or omissions" in advertising and marketing
24 materials. 23 CRR-NY § 200.18(d). As entities engaged in virtual currency business, Defendant
25 is subject to this duty, along with all other duties imposed by the Virtual Currency Law. *See* 23
26 CRR-NY §§ 200.2(q), 200.3(a).

27 138.    The above-described relationship between Defendant and Plaintiff is such that, in morals
28 and good conscience, Plaintiff and the Class had the right to rely upon Defendant for

FOURTH AMENDED CLASS ACTION COMPLAINT: CASE NO. 3:22-CV-03561-MMC

1  information. Coinbase held a leading role within the cryptocurrency exchange market, held
2  itself out as a trustworthy and neutral advisor, and claimed to be the safest place to deal in
3  cryptocurrency. Defendant was in a special position of confidence and trust with Plaintiff and
4  the Class such that Plaintiff and Class members were in special relationship with Coinbase and
5  their reliance on Defendant's negligent misrepresentations was justified. Because of its critical
6  role within the cryptocurrency exchange market, Coinbase was in a superior position to protect
7  against the harm suffered by Plaintiff and Class members.

8  139.    Defendant knew, or reasonably should have known, that Plaintiff and the Class would
9  rely on its misrepresentations and omissions in purchasing UST.

10  140.    Defendant's negligent misrepresentations and omissions, upon which Plaintiff and Class
11  members reasonably and justifiably relied, were intended to induce, and actually induced,
12  Plaintiff and Class members to purchase UST and hold UST at the time it collapsed in May
13  2022.

14  141.    As a direct and proximate cause of their reliance on Defendant's representations,
15  Plaintiff and Class members have been injured as described herein, including in the form of
16  monetary losses, time spent attempting to understand and seek recourse for Coinbase's
17  negligent misrepresentations, and emotional harm resulting from the sudden, unexpected, and
18  catastrophic losses UST incurred. Plaintiff was forced to sit captive and watch as tens of
19  thousands of dollars of his savings vanished by the minute. This was devastating and caused
20  him great stress, anxiety, and outrage. Plaintiff also suffered a loss of time as he was forced to
21  spend hours of his time attempting to stop the depletion of his savings and researching possible
22  options of what to do to remedy the situation. Plaintiff and Class members are entitled to
23  damages available by law, in an amount to be proven at trial.

24                                        **COUNT II**

25           **Violations of Cal. Bus. & Prof. Code §§ 17200 et seq. ("UCL")**

26                        **(on Behalf of the California Subclass)**

27  142.    Plaintiff re-alleges and incorporates by reference the allegations contained in the
28  previous paragraphs as though set forth fully herein.

**FOURTH AMENDED CLASS ACTION COMPLAINT: CASE NO. 3:22-CV-03561-MMC**

1  143.   The UCL prohibits any "unlawful, unfair or fraudulent business act or practice." Cal.

2  Bus. & Prof. Code § 17200, et seq.

3  144.   The acts, omissions, misrepresentations, practices, and non-disclosures of Defendant as

4  alleged herein constitute business acts and practices.[13]

5  145.   **Unlawful**: The acts alleged herein are "unlawful" under the UCL in that they violate at

6  least the following laws:

7      a.  Sections 25110 and 25503 of the California Corporations Code (as established

8          below);

9      b.  Sections 25401 and 25501 of the California Corporations Code (as established

10         below);

11     c.  Sections 25130, 25503, and 25504 of the California Corporations Code (as

12         established below);

13     d.  Sections 25400(d), 25500, and 25504.1 of the California Corporations Code (as

14         established below);

15     e.  Section 1714 of the California Civil Code;

16     f.  Section 5 of the FTC Act;

17     g.  Section 200.18(d) of the State of New York Department of Financial Services'

18         Virtual Currency law

19  146.   **Unfair**: Defendant's conduct with respect to the advertising and sale of UST was

20  "unfair" because Defendant's conduct was immoral, unethical, unscrupulous, or substantially

21  injurious to consumers and the utility of its conduct, if any, does not outweigh the gravity of the

22  harm to its victims. There is no utility in deceptively characterizing the nature and risk of UST

23  as explained above.

24  147.   Defendant's conduct with respect to the advertising and sale of UST was and is unfair

25  because it violates public policy as declared by specific constitutional, statutory or regulatory

26  provisions, including but not limited to Sections 25110, 25503, 25401, 25500, 25130, 25504,

27

28

---

[13] This claim is not based on the theory that UST was an unregistered security.

**FOURTH AMENDED CLASS ACTION COMPLAINT: CASE NO. 3:22-CV-03561-MMC**

1  25400(d), and 25504.1 of the California Corporations Code, Section 1714 of the California

2  Civil Code, Section 5 of the FTC Act, and Section 200.18(d) of the State of New York

3  Department of Financial Services' Virtual Currency law.

4  148.    Defendant's conduct with respect to the advertising and sale of UST was and is unfair

5  because the consumer injury was substantial, not outweighed by benefits to consumers or

6  competition, and not one consumer themselves could reasonably have avoided.

7  149.    **Fraudulent**: A statement or practice is "fraudulent" under the UCL if it is likely to

8  mislead or deceive the public, applying an objective reasonable consumer test.

9  150.    As set forth herein, Defendant's representations regarding UST's independence from

10  volatile non-pegged cryptocurrencies was likely to mislead reasonable consumers to believe that

11  market volatility in non-pegged cryptocurrencies' prices, including LUNA, would not affect

12  UST's price. This was not true.

13  151.    Specifically, Coinbase represented to Plaintiff and the Class, through its statements and

14  asset classification, that UST was a stablecoin, which Coinbase defined as "a digital currency

15  that is pegged to a 'stable' reserve asset like the U.S. dollar or gold," and that, in the case of

16  UST, it was pegged 1:1 to the US dollar.

17  152.    Coinbase also represented that, as a stablecoin, UST "was free from the volatility of

18  non-pegged cryptocurrencies." Plaintiff read and relied on this statement and understood it to

19  mean that UST was not tied to or otherwise affected by the changing price of any non-pegged

20  cryptocurrency. This is an absolute characteristic. As an objective matter of technical operation,

21  UST either is or is not dependent on or otherwise impacted by a non-pegged cryptocurrency.

22  While this statement may be true for stablecoins that are collateralized by a fiat currency,

23  commodity, or other non-crypto asset with cash equivalent, it is demonstrably false as to UST.

24  As explained more fully above, UST's pegged value was fundamentally intertwined with or

25  paired to the price of LUNA, which is a volatile non-pegged cryptocurrency. Coinbase knew

26  this based on its internal assessments of UST, LUNA, and WLUNA.

27  153.    Coinbase also represented to Plaintiff and Class Members that "every digital asset on

28  Coinbase goes through an extensive review process ensuring it meets our security and

1  compliance requirements" and acknowledged its customers see its listing of an asset as an
2  endorsement.

3  154.    As more fully set forth *supra*, Coinbase represented that its rigorous review includes
4  performing due diligence on the key members of the team behind the asset to determine whether
5  they have criminal records or have perpetrated other frauds as well as looking for other "red
6  flags." Also as explained above, Coinbase conducted internal assessments of UST, LUNA, and
7  WLUNA, through which Coinbase was made aware of material information about these tokens,
8  including but not limited to the interconnected nature of UST's price with LUNA's fluctuating
9  price. Coinbase had exclusive or superior knowledge of prior depegging events involving UST
10 as well as other Terra stablecoins tethered to LUNA. It also knew about other material risk
11 factors such as the SEC investigation into Do Kwon and Terraform Lab's Mirror Protocol for
12 potential securities violations.  Coinbase concealed this material information from Plaintiff and
13 Class Members. As described above, some of the internal assessment information was
14 exclusively known to Coinbase. For example, the SEC's investigation into Do Kwon and
15 Terraform Labs before it became public and information in the asset application that was only
16 provided to Coinbase. While some of the sources of information used in Coinbase's internal
17 assessments may technically have been publicly available, a reasonable consumer would not
18 know to look for such sources or how to obtain the correct information, let alone be able to
19 comprehend them. Coinbase performed its internal assessment using specially trained asset
20 researchers with unique knowledge and expertise in assessing cryptocurrencies. Even if Plaintiff
21 or Class Members knew where to find all the same information Coinbase was privy to, they
22 would not have been able to wade through the technical explanations or understand their
23 implication with respect to the risk posed to them. As alleged above, Plaintiff did not read the
24 UST whitepaper and did not know that UST was tied to LUNA and that LUNA had a propensity
25 to cause its pegged stablecoins to depeg. But-for Coinbase's concealment of this fact, Plaintiff
26 would not have purchased UST.

27 155.    Coinbase also knew but failed to disclose that the entire Terraform ecosystem was risky,
28 which is materially relevant to the reliability of UST. Specifically, Coinbase knew but failed to

1 disclose that UST's sister token, LUNA, was responsible for maintaining UST's peg and that
2 LUNA was especially volatile. Coinbase also knew yet failed to disclose that the key
3 individuals responsible for the Terraform ecosystem—Do Kwon in particular—had a history of
4 failed crypto assets, including a prior failed algorithmic stablecoin. Coinbase knew these facts
5 because it performed audits of information submitted to it by Terraform Labs. These audits
6 resulted in "scorecards," filled out for each asset but kept confidential. By listing UST on its
7 exchange, Coinbase implicitly represented that UST had passed Coinbase's rigorous review
8 process through which Coinbase vets its safety and security, its founders, and other possible
9 "red flags." Despite its knowledge of red flags and risk, Coinbase listed both UST and WLUNA
10 but did not disclose any of the knowledge and red flags it exclusively maintained. Had Plaintiff
11 and Class Members known of the high risk assessments, they would not have purchased UST.
12 156.    In doing so, Defendant misrepresented material facts regarding UST stablecoin's nature,
13 purpose, value, volatility, and risk. These omissions rendered Defendant's affirmative
14 representations deceptive and likely to mislead potential purchasers.

15 157.    Coinbase also failed to disclose that the entire Terraform ecosystem was risky, which is
16 materially relevant to the stability of UST. Coinbase also did not disclose that UST's sister
17 token, LUNA, which was responsible for maintaining UST's peg, was especially volatile. Nor
18 did Coinbase disclose that the key individuals responsible for the Terraform ecosystem—Do
19 Kwon in particular—had a history of failed crypto assets, including a prior failed algorithmic
20 stablecoin. This information is material as it directly affects the stability of UST as an
21 algorithmic stablecoin but was not reasonably discoverable by Plaintiff. Yet, Coinbase omitted
22 these key facts and listed it on its website. This runs contrary to Coinbase's representations that
23 it only listed UST after determining it passed Coinbase's rigorous review process through which
24 Coinbase vets its safety and security, its founders, and other possible "red flags." Plaintiff and
25 the Class reasonably relied on Coinbase's endorsement and understood that Coinbase had
26 thoroughly vetted UST.

27 158.    Defendant profited from the sale of the falsely and deceptively advertised UST.
28

1    159.    Had Coinbase disclosed the true nature and characteristics of UST, Plaintiff and
2    members of the California Subclass would not have purchased UST.

3    160.    Defendant's conduct caused and continues to cause substantial injury to Plaintiff and the
4    other Class Members. Defendant continues to publish misleading characterizations of
5    stablecoins, including the UST. Plaintiff has suffered injury in fact as a result of Defendant's
6    unlawful conduct.

7    161.    In accordance with Bus. & Prof. Code § 17203, Plaintiff seeks an order enjoining
8    Defendant from continuing to conduct business through unlawful, unfair, and fraudulent acts
9    and practices, and to commence a corrective advertising campaign explaining the true nature of
10   algorithmic digital assets like UST.

11   162.    Plaintiff and the Class also seek an order for and restitution of all monies from the sale
12   of UST, which were unjustly acquired through acts of unlawful competition, and any other
13   relief allowed under the UCL, including interest and attorneys' fees pursuant to, *inter alia*, Code
14   of Civil Procedure § 1021.5, and to such other and further relief as this Court may deem just
15   and proper.

16                                    **COUNT III**

17          **Violations of Cal. Bus. & Prof. Code §§ 17500, *et seq*. ("FAL")**

18                        **(on Behalf of the California Subclass)**

19   163.    Plaintiff repeats and realleges the allegations in the previous paragraphs as if fully set
20   forth herein. Plaintiff brings this cause ›of action against Defendants' individually and on behalf
21   of the California Subclass.

22   164.    The conduct described herein took place within the state of California and constitutes
23   deceptive or false advertising in violation of California Business and Professions Code §§
24   17500, et seq. [14]

25

26

27   _____

28
     [14] This claim is not based on the theory that UST was an unregistered security.

165.    California Business and Professions Code §§ 17500, et seq. prohibits deceptive or misleading practices in connection with advertising or representations made for the purpose of inducing, or which are likely to induce, consumers to purchase products.

166.    It is also unlawful under the FAL to disseminate statements concerning property or services that are "untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading." *Id.*

167.    Defendant violated the FAL when they marketed, advertised, and promoted exchange services in connection with UST by: (1) misleading Plaintiff and Class members about the benefits of UST, (2) omitting material facts about the volatility and risks of UST, and (3) mischaracterizing UST as a stablecoin when it lacks the qualities and benefits of a stablecoin.

168.    As set forth herein, Defendant's representations regarding UST's independence from volatile non-pegged cryptocurrencies was likely to mislead reasonable consumers to believe that market volatility in non-pegged cryptocurrencies' prices, including LUNA, would not affect UST's price. This was not true.

169.    Specifically, Coinbase represented to Plaintiff and the Class, through its statements and asset classification, that UST was a stablecoin, which Coinbase defined as "a digital currency that is pegged to a 'stable' reserve asset like the U.S. dollar or gold," and that, in the case of UST, it was pegged 1:1 to the US dollar.

170.    Coinbase also represented that, as a stablecoin, UST "was free from the volatility of non-pegged cryptocurrencies." Plaintiff read and relied on this statement and understood it to mean that UST was not tied to or otherwise affected by the changing price of any non-pegged cryptocurrency. This is an absolute characteristic. As an objective matter of technical operation, UST either is or is not dependent on or otherwise impacted by a non-pegged cryptocurrency. While this statement may be true for stablecoins that are collateralized by a fiat currency, commodity, or other non-crypto asset with cash equivalent, it is demonstrably false as to UST. As explained more fully above, UST's pegged value was fundamentally intertwined with or paired to the price of LUNA, which is a volatile non-pegged cryptocurrency. Coinbase knew this based on its internal assessments of UST, LUNA, and WLUNA.

FOURTH AMENDED CLASS ACTION COMPLAINT: CASE NO. 3:22-CV-03561-MMC

171.    Coinbase also represented to Plaintiff and Class Members that "every digital asset on Coinbase goes through an extensive review process ensuring it meets our security and compliance requirements" and acknowledged its customers see its listing of an asset as an endorsement.

172.    As more fully set forth *supra*, Coinbase represented that its rigorous review includes performing due diligence on the key members of the team behind the asset to determine whether they have criminal records or have perpetrated other frauds as well as looking for other "red flags." Also as explained above, Coinbase conducted internal assessments of UST, LUNA, and WLUNA, through which Coinbase was made aware of material information about these tokens, including but not limited to the interconnected nature of UST's price with LUNA's fluctuating price. Coinbase had exclusive or superior knowledge of prior depegging events involving UST as well as other Terra stablecoins tethered to LUNA. It also knew about other material risk factors such as the SEC investigation into Do Kwon and Terraform Lab's Mirror Protocol for potential securities violations.  Coinbase concealed this material information from Plaintiff and Class Members. As described above, some of the internal assessment information was exclusively known to Coinbase. For example, the SEC's investigation into Do Kwon and Terraform Labs before it became public and information in the asset application that was only provided to Coinbase. While some of the sources of information used in Coinbase's internal assessments may technically have been publicly available, a reasonable consumer would not know to look for such sources or how to obtain the correct information, let alone be able to comprehend them. Coinbase performed its internal assessment using specially trained asset researchers with unique knowledge and expertise in assessing cryptocurrencies. Even if Plaintiff or Class Members knew where to find all the same information Coinbase was privy to, they would not have been able to wade through the technical explanations or understand their implication with respect to the risk posed to them. As alleged above, Plaintiff did not read the UST whitepaper and did not know that UST was tied to LUNA and that LUNA had a propensity to cause its pegged stablecoins to depeg. But-for Coinbase's concealment of this fact, Plaintiff would not have purchased UST.

173.    Coinbase also knew but failed to disclose that the entire Terraform ecosystem was risky, which is materially relevant to the reliability of UST. Specifically, Coinbase knew but failed to disclose that UST's sister token, LUNA, was responsible for maintaining UST's peg and that LUNA was especially volatile. Coinbase also knew yet failed to disclose that the key individuals responsible for the Terraform ecosystem—Do Kwon in particular—had a history of failed crypto assets, including a prior failed algorithmic stablecoin. Coinbase knew these facts because it performed audits of information submitted to it by Terraform Labs. These audits resulted in "scorecards," filled out for each asset but kept confidential. By listing UST on its exchange, Coinbase implicitly represented that UST had passed Coinbase's rigorous review process through which Coinbase vets its safety and security, its founders, and other possible "red flags." Despite its knowledge of red flags and risk, Coinbase listed both UST and WLUNA but did not disclose any of the knowledge and red flags it exclusively maintained. Had Plaintiff and Class Members known of the high risk assessments, they would not have purchased UST.

174.    In doing so, Defendant misrepresented material facts regarding UST stablecoin's nature, purpose, value, volatility, and risk. These omissions rendered Defendant's affirmative representations deceptive and likely to mislead potential purchasers.

175.    Coinbase also failed to disclose that the entire Terraform ecosystem was risky, which is materially relevant to the stability of UST. Coinbase also did not disclose that UST's sister token, LUNA, which was responsible for maintaining UST's peg, was especially volatile. Nor did Coinbase disclose that the key individuals responsible for the Terraform ecosystem—Do Kwon in particular—had a history of failed crypto assets, including a prior failed algorithmic stablecoin. This information is material as it directly affects the stability of UST as an algorithmic stablecoin but was not reasonably discoverable by Plaintiff. Yet, Coinbase omitted these key facts and listed it on its website.  This runs contrary to Coinbase's representations that it only listed UST after determining it passed Coinbase's rigorous review process through which Coinbase vets its safety and security, its founders, and other possible "red flags." Plaintiff and the Class reasonably relied on Coinbase's endorsement and understood that Coinbase had thoroughly vetted UST.

176.    Had Coinbase disclosed the true nature and characteristics of UST, Plaintiff and members of the California Subclass would not have purchased UST.

177.    At the time of its misrepresentations and omissions, Defendant was either aware of the risks of mischaracterizing UST free from the volatility of non-pegged cryptocurrencies or was aware that it lacked the information and knowledge required to truthfully make this representation.

178.    Plaintiff has standing to pursue claims under the FAL because he reasonably reviewed and relied on Coinbase's statements when purchasing or exchanging UST on Coinbase.

179.    In reliance on the statements made in Coinbase's advertising and marketing materials, and Coinbase's omissions and concealment of material facts regarding the quality and characteristics of UST, Plaintiff and members of the California Subclass purchased or exchanged UST on Coinbase.

180.    Had Coinbase disclosed the true nature and characteristics of UST, Plaintiff and members of the California Subclass would not have purchased UST.

181.    As a direct and proximate result of Defendant's actions, as set forth herein, Defendant has received ill-gotten gains and profits.

182.    As a result, Plaintiff, the California Subclass Members, and the general public are entitled to injunctive and equitable relief, restitution, and an order for the disgorgement of funds by which Defendant was unjustly enriched.

183.    Pursuant to Cal. Bus. & Prof. Code § 17535, Plaintiff, on behalf of himself and the California Subclass, seeks an order enjoining Defendant from continuing to engage in deceptive business practices, false advertising, and any other act prohibited by law, including those set forth in this Complaint.

///

///

///

1

## COUNT IV

2

### [Unregistered Offer or Sale of Securities by Primary Seller]

3

### Violations of Cal. Corp. Code §§ 25110 & 25503

4

#### (on Behalf of the National Class and, alternatively, the California Subclass)

5    184.    Plaintiff repeats and realleges the allegations in the previous paragraphs as if fully set

6    forth herein. Plaintiff brings this cause of action against Defendant individually and on behalf of

7    the National Class and, alternatively, the California Subclass. Plaintiff alternatively pleads this

8    cause of action under the theory that Coinbase was a secondary seller / non-issuer. *See* Count

9    VI.

10   185.    UST is a security within the meaning of the California Corporations Code, as described

11   above.

12   186.    As explained above, in February 2023, the U.S. Securities and Exchange Commission

13   ("SEC") alleged that UST was being traded as an unregistered security in violation of section 12

14   of the Securities Act. Multiple federal courts have agreed, ruling that UST was, indeed, a

15   security as a matter of law.

16   187.    Defendant, by engaging in the conduct described above within California, directly or

17   indirectly, sold and offered to sell securities.

18   188.    Coinbase offered to sell UST by soliciting sales of UST through numerous mass media

19   platforms. In August 2021, Coinbase posted on its X (formerly known as Twitter) account,

20   announcing that UST could be purchased on its exchange. Coinbase also advertised the sale of

21   UST on the Coinbase platform by posting on the website Medium in August 2021. Coinbase

22   also promoted and solicited sales of UST through posts it made to the popular website Reddit.

23   These posts and advertisements, which were created by Coinbase, directly marketed UST to

24   investors, feeding them to coinbase.com, where the misstatements discussed *supra* led

25   investors, including Plaintiff, to buy UST. Because Coinbase publicly published promotions on

26   X (Twitter), Medium, and Reddit announcing the sale of UST on its exchange, Coinbase

27   solicited UST purchases.

28

189.     These UST transactions benefited Coinbase financially in the form of transaction fees. Coinbase was also one of the largest financial backers of Terraform Labs, the "minters" of UST, and partnered with it to create markets for UST, which would in turn benefit Coinbase.

190.     Through its partnership with Terraform Labs, Coinbase allowed for more UST tokens to be issued to more investors. In the process, Coinbase increased their own profits because it receives a commission for every trade executed.  As such, Coinbase solicited offers to buy UST motivated, at least in part, by its own financial interests.

191.     These UST transactions also conferred a direct or indirect benefit on Terraform Labs, the issuer of UST. The sale of UST on Coinbase enabled Terraform Labs to sell more UST and Terraform Labs directly or indirectly received portions of the purchase price of UST. Moreover, as alleged *supra*, Terraform Labs was in a common enterprise with Plaintiff and other UST investors by virtue of their ownership of UST tokens. The sales of UST via Coinbase caused that common enterprise to grow, thereby benefitting Terraform Labs. Therefore, all UST transactions on Coinbase constitute issuer transactions under the California Corporations Code.

192.     Because UST was available on cryptocurrency exchanges, Defendant's numerous posts and advertisements regarding UST are solicitations to the public at large where the persons or investors being solicited are selected at random, rather than specifically or individually targeted.

193.     Plaintiff and members of the National Class and California Subclass purchased UST securities from Defendant.

194.     No registration statements have been filed with any state or federal government entity or have been in effect with respect to any of the offerings alleged herein.

195.     As a result, Defendant violated Section 25110 and 25503 of the California Corporations Code.

///

///

///

## COUNT V

### Violations of Cal. Corp. Code §§ 25401 & 25501

### [False Statements in the Sale of Unregistered Security by Primary Seller]

### (on Behalf of the National Class and, alternatively, the California Subclass)

196.    Plaintiff repeats and realleges the allegations in the previous paragraphs as if fully set forth herein. Plaintiff brings this cause of action against Defendant individually and on behalf of the National Class and, alternatively, the California Subclass. Plaintiff alternatively pleads this cause of action under the theory that Coinbase was a secondary seller / non-issuer. *See* Count VII.

197.    California Corporations Code section 25401 makes it illegal to "offer or sell a security in this state . . . by means of any written or oral communications which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements made . . . not misleading."

198.    California Corporations Code section 25501 provides statutory civil liability for violations of section 25401.

199.    Defendant was, at the time of the wrongs alleged herein, and as set forth herein, a "person" within the meaning of Section 25401 of the California Corporations Code.

200.    By soliciting sales of UST through numerous posts on its website, blog, and various social media outlets, Defendant sold and offered to sell UST, a security, in the state of California.

201.    Coinbase offered to sell UST by soliciting sales of UST through numerous mass media platforms. In August 2021, Coinbase posted on its X (formerly known as Twitter) account, announcing that UST could be purchased on its exchange. Coinbase also advertised the sale of UST on the Coinbase platform by posting on the website Medium in August 2021. Coinbase also promoted and solicited sales of UST through posts it made to the popular website Reddit. These posts and advertisements, which were created by Coinbase, directly marketed UST to investors, feeding them to coinbase.com, where the misstatements discussed *supra* led investors, including Plaintiff, to buy UST. Because Coinbase publicly published promotions on

1  X (Twitter), Medium, and Reddit announcing the sale of UST on its exchange, Coinbase
2  solicited UST purchases.

3  202.    Defendant, by engaging in the conduct described above within California, sold and
4  offered to sell securities.

5  203.    Defendant caused a false statement or omission to be made in connection with the offers
6  or sales of a security, specifically, the UST. These false statements and omissions are set out in
7  paragraphs 4-5, 11, 42-46, 49-62, and 64-65 of this Complaint.

8  204.    Defendant had knowledge of the falsity or misleading nature of these statements and
9  omissions made in connection with the offers or sales of UST. Alternatively, Defendant was
10  negligent in failing to investigate and discover the falsity of the statements and omissions.

11  205.    Defendant was aware that facts being misrepresented and omitted were material to the
12  buyer's decision to purchase UST.

13  206.    As a result, Defendant is liable for the wrongful conduct complained of herein and is
14  liable to Plaintiff, the National Class, and California Subclass for rescission and/or damages
15  suffered.

16                                    **COUNT VI**

17                    **Violations of Cal. Corp. Code §§ 25130 & 25503**

18          **[Unregistered Offer or Sale of Securities By Non-Issuer/Secondary Seller]**

19          **(on Behalf of the National Class and, alternatively, the California Subclass)**

20  207.    Plaintiff repeats and realleges the allegations in the previous paragraphs as if fully set
21  forth herein. Plaintiff brings this cause of action against Defendant individually and on behalf of
22  the National Class and, alternatively, the California Subclass. This cause of action is pleaded as
23  an alternative to Count IV on the theory that Coinbase is a non-issuer/secondary seller

24  208.    Coinbase materially aided the unlawful offer and sale of UST, a security not qualified or
25  registered or exempt, by providing its exchange platform as the primary marketplace for the
26  distribution of UST to the public.

27  209.    Coinbase actively participated in the sales process by listing UST on its exchange,
28  facilitating buy and sell orders, executing and settling transactions, and holding customer's UST

1 | tokens in custody, thereby enabling and supporting the unregistered offering. Coinbase actively
2 | facilitated retail investor participation in the Terra ecosystem in furtherance of Terraform
3 | Labs's efforts to grow and expand the market for UST.

4 | 210.    As a part of these efforts, Coinbase promoted and advertised the UST to its users and
5 | other members of the public through numerous mass media platforms, publishing promotional
6 | materials, and making favorable representations concerning UST's features, stability, and
7 | investment potential. In August 2021, Coinbase posted on its X (formerly known as Twitter)
8 | account, announcing that UST could be purchased on its exchange. Coinbase also advertised the
9 | sale of UST on the Coinbase platform by posting on the website Medium in August 2021.
10 | Coinbase also promoted and solicited sales of UST through posts it made to the popular website
11 | Reddit. These posts and advertisements, which were created by Coinbase, directly marketed
12 | UST to investors, feeding them to coinbase.com, where the misstatements discussed *supra* in
13 | paragraphs 4-5, 11, 42-46, 49-62, and 64-65 led investors, including Plaintiff, to buy UST.
14 | 211.    Coinbase was the primary marketplace and liquidity provider for UST in the United
15 | States. Coinbase exercised exclusive control and discretion over which digital assets, including
16 | UST, would be listed on its exchange and deployed staff, technology, and marketing resources
17 | to support, enable, and promote the sale of UST to retail investors.

18 | 212.    Coinbase received and retained transaction fees and commissions from each purchase
19 | and sale of UST conducted on its platform, deriving direct financial benefit from the ongoing
20 | unlawful offering. Coinbase was also one of the largest financial backers of Terraform Labs, the
21 | "minters" of UST, and partnered with it to create markets for UST, which would in turn benefit
22 | Coinbase.

23 | 213.    After the collapse of UST in May 2022, Coinbase announced a "temporary" trading
24 | suspension for Terra-related tokens, such as WLUNA and UST, but then maintained the
25 | suspension and prevented proper conversion of assets.

26 | 214.    UST is a security within the meaning of the California Corporations Code, as described
27 | above.

28 |

215.   As explained above, in February 2023, the U.S. Securities and Exchange Commission ("SEC") alleged that UST was being traded as an unregistered security in violation of section 12 of the Securities Act. Multiple federal courts have agreed, ruling that UST was, indeed, a security as a matter of law.

216.   Coinbase knew or reasonably should have known that UST was required to be qualified or registered with the California Department of Financial Protection and Innovation, and that the public sale and distribution of UST on its platform violated section 25110 and/or section 25130. As alleged above, Coinbase's internal assessments of UST, LUNA, and WLUNA revealed numerous risk factors relating to Terra ecosystem products, including that UST was a security. As alleged more fully above, Coinbase was aware as early as May 202 that the SEC was investigating Do Kwon and Terraform Labs' product known as Mirror Protocol. The SEC's investigation focused on whether the native Mirror tokens, mAssets and MIR, which were marketed as having values pegged to real stocks like Apple and Tesla, constituted unregistered securities and whether Terraform Labs and Do Kwon had marketed them to U.S. investors. Coinbase knew of the investigation, as it would have been part of Coinbase's assessment of UST and/or WLUNA, according to Coinbase's description of review criteria. An investigation by the SEC into Kwon and Terraform Labs for potential securities violations was a basis from which Coinbase knew or reasonably should have known that UST was an unregistered security.

217.   No registration statements have been filed with any state or federal government entity or have been in effect with respect to any of the offerings alleged herein.

218.   As a direct and proximate result of Coinbase's material assistance in the unlawful sales of UST in violation of Section 25103, Plaintiff and the Class purchased unregistered securities and suffered substantial financial losses when the value of UST collapsed. But for Coinbase's material aid and participation in the offer and sale of UST, Plaintiff and the Class would not have purchased UST.

219.   Pursuant to sections 25503 and 25504, Coinbase is jointly and severally liable, along with Terraform Labs and any other seller, to Plaintiff and the Class for rescission or damages,

1  statutory interest, and reasonable attorneys' fees and costs by virtue of its direct and substantial

2  involvement in enabling, promoting, and executing UST sales.

3  ## COUNT VII

4  ### Violations of Cal. Corp. Code §§ 25400(d) & 25500

5  **[False Statements in the Sale of Unregistered Security by Non-Issuer/Secondary Seller]**

6  **(on Behalf of the National Class and, alternatively, the California Subclass)**

7  220.    Plaintiff repeats and realleges the allegations in the previous paragraphs as if fully set

8  forth herein. Plaintiff brings this cause of action against Defendant individually and on behalf of

9  the National Class and, alternatively, the California Subclass. This cause of action is pleaded as

10  an alternative to Count V on the theory that Coinbase is a non-issuer/secondary seller.

11  221.    California Corporations Code section 25400(d) makes it unlawful for a broker-dealer or

12  other person selling or offering for sale or purchasing or offering to purchase a security, to

13  make, for the purpose of inducing the purchase or sale of such security by others, any statement

14  which was, at the time and in the light of the circumstances under which it was made, false or

15  misleading with respect to any material fact, or which omitted to state any material fact

16  necessary in order to make the statements made, in the light of the circumstances under which

17  they were made, not misleading, and which he knew or had reasonable ground to believe was so

18  false or misleading.

19  222.    California Corporations Code section 25004 defines a "broker-dealer" as "any person

20  engaged in the business of effecting transactions in securities in this state for the account of

21  others."

22  223.    Under Section 25504.1, any person who materially assists in a violation of Section

23  25401 (or its corollary for secondary liability, Section 25400(d)), with the intent to deceive or

24  defraud may be held jointly and severally liable.

25  224.    Coinbase materially assisted in the violation of California Corporations Code section

26  25401 by actively promoting, facilitating, and executing the sale of UST on its exchange

27  platform, while knowingly or recklessly making false and misleading statements regarding

28  UST's stability and risk profile.

FOURTH AMENDED CLASS ACTION COMPLAINT: CASE NO. 3:22-CV-03561-MMC

225.    Specifically, in offering UST for sale, Coinbase made public statements on its website and in marketing materials representing that, as a stablecoin, UST was "free from the volatility of non-pegged cryptocurrencies," with the intent to induce Plaintiff and the Class to purchase UST. In fact, UST's value was intrinsically tied to the volatility of a non-pegged cryptocurrency LUNA, and Coinbase was aware that these representations were false and misleading at the time they were made.

226.    Coinbase possessed exclusive knowledge, based on its internal assessments of UST, LUNA, and WLUNA, of material risk factors affecting the reliability of UST's purported peg, including prior episodes of volatility, historical crashes of LUNA causing UST and two other Terra stablecoins paired to LUNA's price to lose their pegs, and the fact that the creator of UST, Do Kwon, was under investigation by the SEC for securities violations related to other cryptocurrencies.

227.    Coinbase intentionally concealed this material information from Plaintiff and the Class, omitting from its website, including its UST webpage, any reference to historical volatility, depegging risks due to its tie to LUNA's fluctuating price, and regulatory investigations, in order to deceive potential investors as to the true nature and risk of UST.

228.    By providing the technical infrastructure, trading platform, promotional materials, and transaction processing required for the sale of UST, and by making and disseminating knowingly false or misleading statements with intent to induce purchases, Coinbase materially assisted in the unlawful offer and sale of UST to Plaintiff and the Class.

229.    Coinbase's conduct was done with the intent to deceive or defraud, or at the very least with reckless disregard for the truth and investor protection, and directly resulted in Plaintiff and the Class purchasing UST, thereby suffering substantial financial losses when UST depegged and collapsed in value.

230.    By virtue of this conduct, Coinbase is jointly and severally liable with all other parties that participated in the violation, pursuant to sections 25500 and 25504.1, for rescission or damages, together with statutory interest and attorneys' fees and costs.

## X.    PRAYER FOR RELIEF

WHEREFORE, Plaintiff, individually and on behalf of all other similarly situated members of the Class, prays for relief and judgment, including entry of an order:

A. Declaring that this action is properly maintained as a class action, certifying the proposed Class, appointing Plaintiff as Class Representative and appointing Plaintiff's counsel as Class Counsel;

B. Directing that Defendant bear the costs of any notice sent to the Class;

C. Declaring that Defendant must disgorge, for the benefit of the Class, all or part of the ill-gotten profits they received from the exchange of UST, or order Defendant to make full restitution to Plaintiff and the members of the Class;

D. Awarding restitution and other appropriate equitable relief;

E. Granting an injunction against Defendant to enjoin it from conducting its business through the unlawful, unfair, and fraudulent acts or practices set forth herein;

F. Ordering a jury trial and damages according to proof;

G. Awarding Plaintiff and members of the Class actual damages;

H. Awarding attorneys' fees and litigation costs to Plaintiff and members of the Class;

I. Awarding prejudgment interest and punitive damages as permitted by law; and

J. Ordering such other and further relief as the Court deems just and proper.

## XI.    DEMAND FOR JURY TRIAL

Plaintiff, on behalf of himself and the Class, demands a trial by jury on all issues so triable.

Dated: September 8, 2025.                    Erickson Kramer Osborne, LLP


                                                            /s/Julie Erickson
                                                            Julie Erickson
                                                            Elizabeth Kramer
                                                            Kevin Osborne

                                                            Attorneys for Plaintiff Larry Pearl and the Class

1

## CERTIFICATE OF SERVICE

2

The undersigned hereby certifies that on September 8, 2025 the foregoing document was

3

filed via the Court's ECF system, which will cause a true and correct copy of the same to be

4

served electronically on all ECF-registered counsel of record.

5

6                                              /s/ Julie C. Erickson
                                               Julie Erickson (SBN 29311)
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**FOURTH AMENDED CLASS ACTION COMPLAINT: CASE NO. 3:22-CV-03561-MMC**